David PORTNOY, Plaintiff,

v.

CRYO–CELL INTERNATIONAL, INC., A Delaware corporation, Mercedes Walton, Gaby W. Goubran, Jagdish Sheth, Ph.D., Anthony P. Finch and Scott Christian, Defendants.

C.A. No. 3142–VCS.

Court of Chancery of Delaware.

Submitted: Nov. 30, 2007.
Decided: Jan. 15, 2008.

Richard D. Heins, Esquire, Philip Trainer, Jr., Esquire, Carolyn S. Hake, Esquire, Richard L. Renck, Esquire, Tiffany G. Lydon, Esquire, Ashby & Geddes, Wilmington, Delaware, for plaintiff.

Srinivas M. Raju, Esquire, Blake K. Rohrbacher, Esquire, Jennifer J. Veet, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; Robert S. Faxon, Esquire, Geoffrey J. Ritts, Esquire, Louis A. Chaiten, Esquire, Adrienne M. Ferraro, Esquire, Andrew G. Fiorella, Esquire, Jones Day, Cleveland, Ohio, for defendants.

## OPINION

STRINE, Vice Chancellor.

This case involves a challenge to the results of a contested corporate election.

Cryo–Cell International, Inc. ("Cryo–Cell" or the "Company") is a small public company that has struggled to succeed. By early 2007, several of its large stockholders were considering mounting a proxy contest to replace the board.

One of those stockholders, Andrew Filipowski, used management's fear of replacement to strike a deal for himself to be included in the management slate for the 2007 annual meeting. Another stockholder, plaintiff David Portnoy, filed a dissident slate (the "Portnoy Slate").

Going into the week of the annual meeting, Cryo–Cell's chief executive officer, defendant Mercedes Walton, was desperate because, in her words, "the current board and management [were] losing by huge margins."[1] Aside from actually asking the FBI to intervene in the proxy contest on the side of management, Walton ginned up a plan with Filipowski to win the proxy contest. That plan involved Walton acting as a "matchmaker" by finding stockholders willing to sell their shares to Filipowski. In exchange for this alliance, Walton promised Filipowski that if their "Management Slate" prevailed, Cryo–Cell's board would, using their power as corporate directors, expand the board to add another seat that Filipowski's designee would fill. That designee was a subordinate who had within the recent past resolved an SEC insider trading investigation by agreeing to disgorge trading profits and to be jointly liable for trading profits made by his tippees. This plan was not disclosed to the Cryo–Cell stockholders, who did not realize that if they voted for management, they would in fact be electing a seven, not six member board, with two, not one, Filipowski representatives.

In an effort to secure another key bloc of votes, Walton used a combination of threats (the ending of cooperation on key projects) and inducements (the long-sought but never before granted removal of a restrictive legend) to secure the vote of Saneron CCEL Therapeutics Inc. That leverage was enhanced by the fact that Cryo–Cell owned 38% of Saneron's shares and that Saneron depended on Cryo–Cell's laboratory space to conduct many of its own operations. Notwithstanding that, Saneron had gone into the week before the meeting undecided about how to vote. Walton "locked up" Saneron only after employing these persuasive strategies involving the threatened withholding and actual granting of concessions on the part of Cryo–Cell as a corporation.[2]

Even after employing these methods, Walton and her board went into the day of the annual meeting fearing defeat. They had rented the meeting room from the 11 a.m. start time only until 1 p.m. But Walton did not want to close the polls and count the vote when the scheduled presentations at the meeting were over. So she had members of her management team make long, unscheduled presentations to give her side more time to gather votes and ensure that they had locked in two key blocs. She overruled motions to close the polls.

Even after the filibusters, Walton still harbored doubt that the Management Slate would prevail if the vote was counted and the meeting was concluded. So, at around 2 p.m., Walton declared a very late lunch break, supposedly in response to a request made much earlier.

In fact, Walton desired the break so that she would have more time to seek votes and so that she could confirm that the

---

1. Joint Exhibit ("JX") 189.

2. JX 218.

major blockholders had switched their votes to favor the Management Slate. Only after confirming the switches did Walton resume the meeting at approximately 4:45 p.m., declare the polls closed, and have the vote counted.

The post-meeting vote count resulted in the Management Slate squeaking out a victory by an extremely small margin. Immediately after that, Walton began preparing to add Filipowski's designee to the Cryo–Cell board. Only after this challenge was brought to the election by Portnoy did that process slow down, and only for the obvious reason that the litigation was brought.

In this opinion, I decline Portnoy's request to declare his side the victor in the election process. But I do agree with him that the election results were tainted by inequitable behavior by Walton and her allies and must be set aside. In particular, I conclude that the Cryo–Cell stockholders cast their votes in ignorance of material facts regarding the promise made to Filipowski regarding a second board seat and the pressure that Walton was exerting on Saneron—both of which involved the use by Walton of corporate resources and fiduciary authority motivated by the desire to protect herself from the risk of losing her corporate offices.

Rather than seating a board for the Cryo–Cell stockholders, I believe the more appropriate remedy to be a requirement that Cryo–Cell have another election at a special meeting to be held promptly. Because the stockholders should not be required to bear extra expense because of management's misconduct, the Management Slate will be required to fund their own re-election campaign and to pay any costs incurred by the Company to hold the special meeting, including the cost of a special master to preside over the meeting.

## I. *Factual Background*

### A. *Cryo–Cell's Business*

Cryo–Cell is a Delaware corporation with its primary business being the cryopreservation of umbilical cord stem cells of its clients for possible later medical use by their family members. Cryo–Cell was founded in 1989 by Dan Richard. Richard's resignation from his positions as CEO and Chairman of Cryo–Cell in 2002 signaled the beginning of a troublesome period for the Company. In 2003, Cryo–Cell incurred a net loss of $7.5 million on $7.5 million in revenues, the Company's stock was delisted from NASDAQ, the Company went through three different audit firms, and the Company was the defendant in several lawsuits.[3] During that same time period, Mercedes Walton, who had served as a Cryo–Cell director since 2000, began to play a dominant role at the Company. She replaced Richard as Chairman after he left in 2002 and was later appointed as Cryo–Cell's interim CEO in 2003 after the CEO who succeeded Richard resigned. In 2005, Walton was appointed as CEO on a non-interim basis.

Although Cryo–Cell's current situation is not as dim as it was in 2003, it continues to struggle as a company. In 2006, Cryo–Cell incurred a net loss of $2.8 million on $17 million in revenue. It again lost money in 2007. Moreover, Cryo–Cell, which was the first company to enter the now fragmented cord blood industry, is losing market share to its competitors. According to the Company, however, its future prospects look brighter, at least in part based on the launch of a new product line, C'elle. C'elle, which was launched on November 1, 2007, is Cryo–Cell's proprietary

---

**3.** Trial Transcript ("Tr.") at 313.

menstrual stem cell collection and storage service.

Before the 2007 annual meeting, Cryo–Cell's board of directors had five directors. Those directors join Cryo–Cell as the defendants in this action. Walton, Cryo–Cell's Chairman and CEO, was the lone inside director. The outside directors were Gaby W. Goubran, Jadish Sheth, Anthony P. Finch, and Scott Christian. Walton, Sheth, and Christian were used to working together—they were directors together at Norstan, Inc., a Minnesota telecommunications company, before it was acquired by Black Box Corporation in 2005.[4] Other than the options that they held as compensation for their service at Cryo–Cell, the directors did not own large equity positions in Cryo–Cell.[5]

### B. *Stockholder Discontent With Cryo–Cell*

By late 2006, Cryo–Cell's stockholders were unhappy with the Company's performance. That discontent was amplified when Cryo–Cell's board of directors amended the Company's bylaws in December 2006 (the "Bylaw Amendments"). The Bylaw Amendments imposed additional requirements on stockholders seeking to bring business before the board or nominate directors, restricted stockholders' ability to call special meetings of stockholders, limited the ability of stockholders to act by written consent, and purported to place a supermajority requirement on the stockholders' ability to amend the new bylaw provisions.[6]

The first group of stockholders to communicate its unhappiness with Cryo–Cell's performance and the Bylaw Amendments to Cryo–Cell's board in writing was the "Filipowski Group." The Filipowski Group, a collection of Cryo–Cell stockholders who owned approximately 6% of the Company at that time, is composed of SilkRoad Equity, the private investment firm of Andrew Filipowski, a wealthy entrepreneur, and Matthew Roszak; Filipowski and Roszak individually; and the Andrew J. Filipowski Revocable Trust (the "Filipowski Trust"). Filipowski is the top dog at SilkRoad. Roszak is his key subordinate.

In its January 9, 2007 letter, the Filipowski Group wrote that the Bylaw Amendments were "a way for existing management to entrench itself and to perpetuate its role with the Company and the economic benefits that go along with that."[7] In addition, the letter "question[ed] the sincerity and ability of the current directors to provide leadership and support stockholders' interests."[8] The letter threatened legal action against the board and stated that the Filipowski Group was "considering proposing a slate of directors to replace" the current board.[9] In concluding the letter, the Filipowski Group noted that it was available to meet with the board to discuss its concerns. Filipowski and Roszak would meet with Walton in February 2007—more on that meeting later.

The Filipowski Group was not the only stockholder group to express its negative

---

4. Tr. at 264–65; JX 117 at CRYO 491–92.

5. JX 117 at CRYO 500. The directors owning the largest positions in Cryo–Cell were Finch with 104,500 shares and Walton with 40,000 shares.

6. JX 16.

7. JX 22.

8. JX 22.

9. JX 22.

reaction to the Bylaw Amendments. The "Portnoy Group"[10]—a group of affiliated stockholders led by David Portnoy that owned approximately 12% of Cryo–Cell at that time—filed a Schedule 13 D/A on January 31, 2007, voicing its dissatisfaction with management and the Bylaw Amendments.[11] The Portnoy Group letter, similar to the Filipowski Group letter, indicated the possibility of litigation over the Bylaw Amendments and other issues and expressed a willingness to have further discussions with the Cryo–Cell board. Cryo–Cell, however, did not respond to that invitation because Walton had concluded that Portnoy "was not a reasonable person to deal with."[12] Walton formed this opinion of Portnoy based on a meeting in 2004, just after Portnoy became an investor in Cryo–Cell, as well as from subsequent telephone calls.

The Filipowski Group and the Portnoy Group were not acting entirely independently of one another—they were sharing their concerns about Cryo–Cell during late 2006 and early 2007.[13] In fact, Filipowski would later claim that the content of the Filipowski Group's letter criticizing Cryo–Cell's management was primarily the result of input from Portnoy.[14] The communication between the Filipowski and Portnoy Groups would continue, but they would ultimately align on opposite sides of the ensuing proxy contest.

## C. *The Portnoy Group Decides To Wage A Proxy Contest*

After receiving no response from Cryo–Cell to its January letter expressing disappointment with the Company's results and the Bylaw Amendments, the Portnoy Group decided to solicit proxies to elect its own slate of directors at the upcoming Cryo–Cell annual meeting. In hope of putting together a competitive slate and garnering support from another large stockholder, Portnoy had discussions with the Filipowski Group about combining forces. Specifically, Portnoy and Roszak exchanged emails in the week before the deadline for filing a proxy statement in advance of the Cryo–Cell annual meeting.[15] Roszak suggested that the Filipowski Group put up two directors and the Portnoy Group put up two directors with the fifth director being either Walton or a mutually acceptable candidate. Portnoy responded that the Portnoy Group would only offer one board seat to Filipowski and only if the Filipowski Group paid a portion of the proxy solicitation costs and agreed to vote its shares in favor of the Portnoy Group slate.

The Filipowski Group never responded to the Portnoy Group's proposal for two reasons. One was that Filipowski had doubts about the experience, qualifications, and intentions of the proposed members of the Portnoy Group slate. The Filipowski Group was especially concerned about the proposed board member that the Filipow-

10. The Portnoy Group is composed of David Portnoy; Visual Investment Corp., a Delaware corporation; PartnerCommunity, Inc., a Delaware corporation; Jamie H. Zidell; Mayim Investment Limited Partnership, a Delaware limited partnership; David Ruttenberg; Liza Amar; Lynne Portnoy; Gilbert Portnoy; Mark Portnoy; Capital Asset Fund Limited Partnership, a Delaware limited partnership; George Gaines; Scott D. Martin; and Steven Berkowitz. JX 25 at 16.

11. JX 25 at 30.

12. Tr. at 321.

13. *See* JX 15 (November 2006 email chain between Portnoy and Roszak) and JX 43A (March 2007 email chain between Portnoy and Roszak).

14. Tr. at 168.

15. JX 43A.

ski Group believed that the Portnoy Group intended to have serve as CEO.[16]

The Filipowski Group's concerns about the Portnoy Group's slate were not irrational. The slate ultimately proposed by the Portnoy Group on March 26, 2007 was David Portnoy, Mark Portnoy, Craig Fleishman, M.D., Harold Berger, and Scott Martin (the "Portnoy Slate").[17] Later, when Cryo–Cell expanded its slate, John Yin was added to the Portnoy Slate.[18] No members of the Portnoy Slate had ever served as a director of a public company.[19] Moreover, none of the members of the Portnoy Slate had any experience in the stem cell industry. David Portnoy and his brother, Mark Portnoy, the individuals primarily responsible for making the strategic decisions for the Portnoy Group, are private investors. Fleishman is a cardiologist. Berger is Mark Portnoy's accountant. Yin is the CEO of a privately held technology company in which David Portnoy is a major investor. Martin, the proposed board member that the Filipowski Group believed would be installed as CEO,[20] had the most relevant experience managing an operating company, having served as CEO of a very large HVAC company with revenues and profits far in excess of Cryo–Cell's. But that corporation was in a very different industry and was not a public company. The Portnoy Slate's lack of expertise in the stem cell industry and inexperience with public companies and proxy contests was evident in the vague business plan they ultimately presented in their proxy statement, which consisted of generic statements about eliminating unnecessary costs and considering strategic alternatives to increase stockholder value.[21]

But even more than Filipowski's doubts about Portnoy's proposed slate, another more important reason inspired Filipowski to eschew an alliance with Portnoy: He was cutting his own deal with Cryo–Cell management that would give him the influence he sought.

### D. *The Filipowski Group Joins Forces With Management*

Turned off by Portnoy, the Filipowski Group decided to consider supporting Cryo–Cell's management in the proxy contest but subject to a very important condition—which was that Filipowski get a seat at the board table.

The Filipowski Group and Cryo–Cell's management began to form this alliance at a February 2007 meeting held at Cryo–Cell's headquarters. At that meeting, held in response to the Filipowski Group's January letter, Filipowski and his chief aide, Roszak, discussed their concerns about Cryo–Cell with Walton, Jill Taymans, Cryo–Cell's Vice President of Finance, and other members of Cryo–Cell's management team. Walton characterized it as "a very positive meeting."[22] The Filipowski Group was also pleased with the meeting. Filipowski described his view of management after the meeting as follows: "I felt that they were very much on top of their business, knew where the future of the business lay, and were very much anxious to pursue what I thought was a very logical appropriate strategy."[23] Filipowski's

**16.** Tr. at 155.

**17.** JX 46 at CRYO 114.

**18.** JX 126 at CRYO 317.

**19.** Tr. at 28.

**20.** Tr. at 155.

**21.** JX 126 at CRYO 318.

**22.** Tr. at 323.

**23.** Tr. at 153.

take on the appropriate strategy for Cryo–Cell—focusing on upgrading their services to collect and store additional types of stem cells—differed materially from what Filipowski understood the Portnoy Group's strategy to be—focusing only on collecting and storing stem cells from cord blood.[24]

Despite the positive tone of the February meeting, the Filipowski Group did not immediately join forces with management. Instead, the Filipowski Group continued discussions with the Portnoy Group about a possible joint slate into late March.[25] At the same time that the Filipowski Group was considering the Portnoy Group's offer of a position on its slate for Filipowski, the Filipowski Group was negotiating with Walton about a separate slate. Early in the negotiations, Roszak suggested a Filipowski Group slate that would include four new outside directors plus Walton as the management representative.[26] In the board meeting held the week after Roszak's suggestion of a separate Filipowski Slate, Walton informed the board of her discussions with the Filipowski Group.[27] The board's response was to consider whether anyone from the Filipowski Group should be invited to join the Management Slate. The board assigned Walton to continue discussions with Roszak. The day of that board meeting Walton emailed Roszak the board's required profile for new board members: "we're looking for a combination of healthcare and business background (preferably women's healthcare); stem cell industry (huge plus); P & L; public company board experience; marquee recognition in their field. The board is unanimous in our belief that this profile

is a requisite."[28] During the discussions over adding board members, Roszak provided Walton with the names and profiles of several board candidates. Ultimately, however, the negotiations between the Filipowski Group and Walton centered on increasing the size of the board of directors by one seat effective the date of the annual meeting and adding Filipowski to the Management Slate to fill that seat. This focus on Filipowski was somewhat of a reversal for the board because, as defendant Christian admitted at trial, Filipowski did not fit the board's required profile.[29]

In mid-April, once the board was focused on the tactical utility of adding Filipowski to the Management Slate, it followed its normal protocol for considering a new board member. Cryo–Cell had Filipowski sign a confidentiality agreement and fill out the usual directors and officers and director independence and committee compliance questionnaires.[30] Cryo–Cell also had a private investigator perform a background investigation on Filipowski.[31] On May 21, 2007, the corporate governance committee of Cryo–Cell's board met to discuss the procedures that would be used to evaluate Filipowski's candidacy and determine whether to add him as a nominee on the Management Slate. At that meeting, Walton emphasized the importance of the decision and the need for an expeditious decision so that Filipowski could be included in the proxy statement in advance of the annual meeting. Walton also told the committee members that "although initially Mr. Filipowski had proposed the names of other nominees, he had

24. Tr. at 155–56.

25. JX 43A.

26. Tr. at 171; JX 44.

27. JX 54.

28. JX 55.

29. Tr. at 269.

30. JX 64; JX 76.

31. JX 73.

subsequently confirmed that his agreement to support management's slate *was conditioned on his nomination to the Board.*[32] The committee members proceeded on to discuss "the possible results of a proxy contest, with or without Mr. Filipowski's support."[33]

In addition to its conversations about the proxy contest, the committee discussed Filipowski's qualifications and reputation. Cryo–Cell considered Filipowski an interesting candidate for its board for several reasons. Filipowski had extensive entrepreneurial experience, having founded and developed several technology companies, including one that sold for nearly $4 billion.[34] Filipowski had served as chairman of the Wake Forest Institute for Regenerative Medicine and was knowledgeable and passionate about the stem-cell industry.[35] Moreover, Filipowski's ability to represent the perspective of a large shareholder was attractive.[36] Filipowski's background, however, was not without blemish. The committee members were concerned about litigation and bankruptcies involving the companies with which Filipowski was previously associated.[37] In addition, the committee was concerned about an SEC investigation of Roszak for insider trading in

Blue Rhino Corporation stock. That SEC investigation involved whether Roszak had traded on and tipped others about non-public information that Roszak garnered from Filipowski, who was a director of Blue Rhino.[38] The resolution of that investigation resulted in Roszak entering into a consent decree with the SEC whereby he (without admitting liability) disgorged the profits from his own trades in Blue Rhino's shares, accepted joint and several liability for disgorgement of the profits of his tippees for their trading in Blue Rhino shares, and paid a civil penalty.[39]

In light of the committee's concerns about Filipowski and its desire to add Filipowski to the Management Slate if those concerns could be allayed, the committee set up a conference call with Filipowski. The conference call involved a detailed discussion of Filipowski's prior activities and what he could contribute to the board.[40] The committee satisfied itself that there were not any criminal or ethical problems with Filipowski's prior business dealings and that the SEC's investigation and imposition of agreed sanctions against Roszak for insider trading and tipping violations of Rule 10b–5 did not implicate Filipowski in

---

**32.** JX 84 (emphasis added).

**33.** JX 84.

**34.** JX 80.

**35.** Tr. at 329–30.

**36.** Tr. at 330.

**37.** JX 84.

**38.** Tr. 476–80; JX 74. The defendants contend that Joint Exhibit 74, which includes information about Roszak's SEC litigation, is inadmissible under Delaware Uniform Rules of Evidence 402, 403, 404, and 608. Their objection is overruled for the same reasons I overruled their objection to testimony about

Roszak's SEC litigation at trial—the defendants affirmatively put that information at issue by alleging the Portnoy Slate is unqualified and by touting the credibility of the deliberative process the Cryo–Cell board undertook before adding Filipowski to the Management Slate. *See* Tr. at 389–90. The *defendants also defended their decision to* add (or in their view, to consider) Roszak as a board member. The final judgment in Roszak's SEC litigation is a publicly filed court document, which incorporates the consent decree that was voluntarily entered into by Roszak, and is reliable, relevant evidence. JX 74 at CRYO 3111–14.

**39.** JX 74 at CRYO 3112.

**40.** JX 93.

any wrongdoing.[41] The committee then decided that a face-to-face meeting with Filipowski would be beneficial before making a final determination on his candidacy.

On May 24, 2007, Gaby Goubran, the chair of the committee, flew in from Europe and met with Filipowski. Goubran had a positive meeting with Filipowski, and after he reported the results of the meeting to the committee later that day, the committee unanimously approved Filipowski's candidacy.[42] The following day the entire Cryo–Cell board approved the expansion of the board and Filipowski's inclusion on the Management Slate, subject to the negotiation of a suitable standstill and voting agreement with Filipowski.[43] Thus, the Management Slate of directors that Cryo–Cell would put forth for election at the annual meeting would include the five incumbent directors and Filipowski.

The contemplated standstill and voting agreement between Filipowski and the Company (the "Voting Agreement") was executed and filed with the SEC on June 4, 2007.[44] The Voting Agreement stated that Cryo–Cell would expand the board by one seat, effective at the date of the 2007 annual meeting, and that it would include Filipowski as the nominee for that seat on the Management Slate. In return, Filipowski, Roszak, and the Filipowski Trust agreed to vote any shares they controlled in favor of the Management Slate. In addition, they agreed to standstill on various matters until after the 2008 annual meeting.

Despite the (non-credible) insistence of defendant Scott Christian, one of Cryo–Cell's outside directors, that Filipowski's nomination "[h]ad nothing to do with the proxy contest,"[45] Filipowski was clearly added to the Management Slate to increase the odds that the Management Slate would prevail in the upcoming proxy contest. As Walton explained to the Director of the Wake Forest Institute for Regenerative Medicine, Filipowski and the incumbent directors on the Management Slate were "very strange bedfellows indeed."[46] Immediately after the public disclosure of the agreement with Filipowski, Walton underscored the connection between the proxy contest and adding Filipowski to the Management Slate by emailing the following message board post to Taymans, Cryo–Cell's counsel, and its proxy solicitor with the comment that she hoped the author was "right on the money": "No Greater Coup … Could Possibly have been accomplished!!! [Filipowski] joining the board 'lays to waste' considerable efforts and monies squandered on the 'overthrow' … Game, Set, Match? ? Me thinks so. JMHFO."[47]

I also find that as Walton told the committee on May 21, 2007, Filipowski would not have supported the Management Slate unless he was a candidate on that Slate. Absent the board's willingness to include him, Filipowski almost certainly would have bargained with Portnoy over the shape of a unified insurgent slate and cast his lot with the outsiders.

### E. *The Proxy Contest Begins*

On June 8, 2007, Cryo–Cell filed its definitive proxy statement which indicated

41. Tr. at 249–50; 476–80.

42. JX 100.

43. JX 100.

44. JX 119.

45. Tr. at 267.

46. JX 134.

47. JX 115.

the Cryo–Cell annual meeting would be held on July 16.[48] Although the Cryo–Cell 2007 annual meeting had been scheduled for June 28, the meeting was delayed until July 16 because, among other things, both sides were late in getting out their definitive proxy statements. The Cryo–Cell board delayed the meeting "to allow more time for both sides to get their proxy materials out and allow shareholders to conscientiously consider each side's positions."[49]

The Portnoy Group filed its definitive proxy statement on June 13, 2007.[50] After that filing, both sides began a vigorous proxy solicitation process. Both sides hired experienced proxy solicitors to help with election tactics and call stockholders to solicit votes. In addition, both sides sent several fight letters to Cryo–Cell's stockholders, detailing why those stockholders should return their proxy card instead of their opponent's proxy card.

Both sides also attempted to personally solicit Cryo–Cell's largest stockholders. Ki Yong Choi, the president of a San Francisco hotel operations and management company, was one of those stockholders. Choi was the beneficial owner of approximately 3% of Cryo–Cell's shares at the beginning of the proxy contest. Walton solicited Choi over the phone on June 18, 2007. Walton described the call as "delightfully uplifting" and Choi as "most supportive," indicating that Choi "asked for assistance in buying more shares."[51] In early July, Mark Portnoy traveled to San Francisco to solicit Choi's vote. According to Mark Portnoy, that meeting

"went ok … [b]ut [Choi] wants to be the one in control."[52] Although Choi's allegiance appeared up for grabs to Mark Portnoy, Choi would later join Filipowski in siding with management.

### F. *Cryo–Cell's Plan To Come From Behind And Win The Election*

As the July 16 annual meeting approached, the status of the early vote became clear—the Portnoy Group held a big lead over the Management Slate. Of Cryo–Cell's 11,669,629 million shares outstanding, the July 12, 2007 vote report from Cryo–Cell's proxy solicitor showed 4,106,441 shares voting for the Portnoy Slate compared to only 2,098,579 shares voting for the Management Slate.[53] Walton was rendered desperate and, frankly, irrational at this state of affairs.

I do not say this lightly, but it is undisputed that Walton sought to have the Federal Bureau of Investigation intervene in the proxy fight. She emailed the July 12 vote report to an FBI agent who was investigating (at her instance) whether Dan Richard had stolen Cryo–Cell client data and explained that the vote report showed that "the current board and management are losing by huge margins."[54] Walton then requested that "[i]f there is any evidence that Dan Richard was involved in corporate theft of CCEL client's [sic] data; and is in turn corroborating with Portnoy to get control of CCEL, the SEC Enforcement Division must be notified immediately.... We are running out of time, literally."[55]

**48.** JX 117.

**49.** JX 122.

**50.** JX 126.

**51.** JX 143.

**52.** JX 163.

**53.** JX 187.

**54.** JX 189.

**55.** JX 189.

On a somewhat more traditional front, Walton developed a two-prong strategy to overcome the vote deficit. The first prong was to intensify the campaigning efforts.[56] The second prong was for Walton to act as a "matchmaker" by putting prospective sellers of shares in touch with "shareholders with significant financial resources [who] had expressed to management their opposition to the Portnoy Group's attempt to take over control of the Company."[57] Those shareholders were Filipowski and Choi.[58] The prospective sellers "were only those who had either not voted or had already voted but voted for the Portnoy slate."[59] Walton disclosed her plan to the Cryo–Cell board at a July 12, 2007 telephone meeting. She asked the board to postpone the annual meeting a few days to allow her matchmaking plan time to take effect, but counsel advised the board that the meeting could not be postponed.[60] The board members did, however, "generally express[ ] their support for taking valid actions that would increase the likelihood that management's slate of directors would be elected."[61]

Walton formulated her matchmaking plan in the days before the July 12 board meeting based on discussions she had with Filipowski and his operative Roszak. Those discussions centered on the Filipowski Group buying additional Cryo–Cell shares to vote them in favor of the Management Slate.[62] Filipowski explained that he "wanted to accumulate as many shares as possible in order to be able to vote [his] opinion on how the company should proceed."[63] But the Filipowski Group wanted concessions in return for buying more Cryo–Cell shares. Roszak demanded two things on Filipowski's behalf: (1) that management, the incumbent directors, and the Company use their own resources to purchase additional Cryo–Cell shares, and (2) that the Filipowski Group be given additional board seats beyond the seat that would be held by Filipowski if the Management Slate prevailed.[64] As to the first request for participation in buying additional shares, Walton's response was an "emphatic 'no way.'"[65] Her response to the request for additional board representation was much warmer, and, I find, signaled very clearly that the answer would be yes.[66] That is, I find that Walton made clear that Filipowski would get a second board seat if the share buying plan resulted in a Management Slate victory.

The difficulty for Walton and Roszak was how to deal with Choi. They wanted him to buy more shares and support the Management Slate but not to give him board seats. So Walton played coy with Choi. Therefore, Walton called Choi the night of the board meeting to discuss and

---

56. Tr. at 347–48.

57. JX 190.

58. Tr. at 348.

59. Tr. at 424.

60. Tr. at 417.

61. JX 190.

62. Tr. at 418; JX 194.

63. Tr. at 161.

64. Tr. at 354–55, 418–19.

65. Tr. at 355.

66. Tr. at 355. This response was consistent with Walton's perhaps feigned, but overtly effusive relationship with Filipowski. A June 13 email from Walton to Filipowski and Roszak captures that dynamic:

> Flip ... you are most definitely CCEL's "Earth Angel"! A million thanks to you and Matt for being there when it counts the most. *We will never disappoint you* ... Big Hugs, Mercedes

JX 125 (emphasis added).

confirm the matchmaking plan.[67] Choi, according to Cryo–Cell's proxy solicitor, requested two board seats and Walton indicated to Choi that although she could not grant his request, the board would consider it.[68]

After confirming Choi's participation in her plan, Walton emailed the Filipowski Group to let them know that "[t]he board has a proposed strategy on turning the plurality in our favor—some aspects include what you and Flip proposed earlier this week; but other elements have been added as well."[69] Those other elements were the addition of Choi to the buying effort.[70] When Roszak responded "[l]ove the energy here and sounds like a plan," Walton told him that " '[w]e will either find a way, or make one.' "[71] The following morning, Friday, July 13, 2007, Walton held a conference call with the Filipowski Group to further discuss the matchmaking plan. That same day, Walton ensured that those involved in the matchmaking plan—the Filipowski Group and Choi and his broker, Chris Kovarik—had each other's contact information and the contact information for Cryo–Cell's executives, its proxy solicitor, and its counsel. More importantly, Walton made sure that Choi and Filipowski had the contact information for the large Cryo–Cell stockholders who had either voted for the Portnoy slate or were undecided. Three of those large stockholders would turn out to be particularly important to the election—Lewis Asset Management, Saneron, and Apollo Capital.

### G. The Lewis Shares

Lewis Asset Management owned approximately one million shares of Cryo–Cell stock during the time leading up to the Cryo–Cell annual meeting—almost 9% of the shares outstanding.[72] Before July 14, 2007, the Saturday before the Cryo–Cell annual meeting, the proxy for the Lewis shares had been submitted in favor of the Portnoy Slate. The vote attached to the Lewis shares would change, however, after Choi entered an agreement to purchase the Lewis shares with a proxy attached on July 14. Walton, who had brokered the deal by putting Kovarik in touch with Lewis Asset Management, would later be surprised by how those votes would change. On Monday, July 16, only hours before the annual meeting, Walton would find out that Choi had submitted the proxies for the Lewis shares and the other shares he owned in favor of the Management Slate, but withheld proxies on three of the directors.[73] That turn of events would have later consequences.

### H. The Saneron Shares

Saneron is a research firm with a focus on cellular therapy. Cryo–Cell owns 38% of Saneron and Saneron owns 253,800 shares of Cryo–Cell (about 2% of the outstanding shares). Cryo–Cell and Saneron are involved in many collaborative projects.[74] In addition, Saneron uses Cryo–Cell's clinical lab and regulated manufacturing facility, which Saneron needs to get into clinical trials.[75]

67. Tr. at 422.

68. Tr. at 214–15, 424–25.

69. JX 194.

70. Tr. at 424.

71. JX 194.

72. JX 266 at 3.

73. Tr. at 443.

74. Tr. at 335, 342.

75. Sanberg Dep. at 17.

Despite the close relationship between Cryo–Cell and Saneron, Walton was concerned about how Saneron would vote its shares in the proxy contest.[76] This concern was the result of Saneron not voting its shares in favor of the Management Slate early in the proxy contest and a "weird" conversation that Taymans had with Nicole Kuzmin–Nichols, Saneron's Vice President of Business Development, on June 18 when she asked about how Saneron was going to vote its shares.[77] Walton's immediate response was to forward Taymans' email to Dr. Julie Allickson, Cryo–Cell's Vice President of Research and Development and Laboratory Operations, instructing her that "we can not move forward with any agreements with Saneron until this matter is positively closed." [78]

Walton's concerns and frustration grew with time. She repeatedly tried without success to contact Dr. Paul Sanberg, Saneron's Chairman and co-founder, about Saneron's vote and still had no proxy card from Saneron. Therefore, on June 27, Walton instructed Allickson to "pause communication with [Saneron] on the project until this matter is positively addressed." [79] Although Walton claimed that her emails about withholding cooperation from Saneron were only internal emails, the silence on the joint projects combined with the requests for Saneron to submit its vote in favor of the Management Slate sent a clear message to Saneron—its vote in favor of the Management Slate was required if it wanted to continue working with Cryo–Cell. This signal's strength was undoubtedly enhanced by Cryo–Cell's ownership of 38% of Saneron.

In addition to withholding its cooperation on joint projects, Cryo–Cell had another means to coerce Saneron's vote—the restrictive legend on Saneron's Cryo–Cell shares. That restrictive legend stated that the shares could not be sold without a registration statement or "an opinion of company counsel that such registration was not required." [80] Saneron had been requesting a counsel opinion authorizing removal of the restriction since January 2005.[81] Cryo–Cell had stonewalled, never agreeing to Saneron's request. Although the defendants now contend that Saneron was not interested in a counsel opinion from Cryo–Cell removing the restriction because it did not need that action to sell, Saneron's and Cryo–Cell's actions belie that.[82] During the discussions Saneron had with Cryo–Cell about how it would

76. Tr. at 339–40.

77. JX 136.

78. JX 136.

79. JX 146.

80. JX 2.

81. JX 4.

82. The defendants' arguments that the counsel opinion lifting the restriction on the Saneron shares was not meaningful to Saneron because it could obtain a similar opinion from its own counsel and that Saneron did not intend to sell its shares for less than $5 per share, which was materially above the prevailing market price, are similarly unconvincing. If the opinion lifting the restriction were so unimportant, why did Saneron keep asking for it? Likely because, as a practical matter, any prospective purchaser would request that the restrictive legend be removed because the legend, which was typed on the face of the stock certificate, explicitly stated that the shares could only be transferred if they were effectively registered or Cryo–Cell's counsel issued an opinion that registration was not required. In addition, Kuzmin–Nichols indicated that Saneron needed capital and that one of the options being considered for obtaining that capital was selling its Cryo–Cell stock, even though it was trading at less than $5 per share. Kuzmin–Nichols Dep. at 60–61.

vote in the proxy contest, Saneron's desire to have the restrictive legend removed was an important and frequently discussed topic. For example, removal of the restrictive legend was discussed in a June 27, 2007 email from Kuzmin–Nichols to Taymans [83] and at Saneron's own annual meeting on July 12.[84]

Despite Saneron's requests, Cryo–Cell withheld the counsel opinion lifting the restrictive legend. Instead, Walton, discouraged that Sanberg had not returned her numerous phone calls, attempted to arrange for Choi and Filipowski to purchase the Saneron shares.[85] On July 14, even after she learned that Choi had acquired the Lewis shares, Walton still was concerned about the Saneron shares. She explained her concern in an email to Roszak: "Without Saneron we are at risk. No news this a[.]m[.] on Saneron—working every angle with [Kovarik, Choi's broker] to get to [Sanberg]."[86] On July 15, Walton learned that the efforts by Filipowski and Choi to purchase the Saneron shares had fallen through.[87] In response, she called Sanberg and offered what Saneron had sought from Cryo–Cell for the previous several years, the counsel opinion removing the restriction on Saneron's shares. Walton had Cryo–Cell's counsel draft and fax the opinion letter to Saneron that Sunday.[88] That counsel opinion, which was also faxed to Cryo–Cell's transfer agent, informed the transfer agent that Cryo–Cell had no objection to the transfer agent reissuing a stock certificate to Saneron without the restrictive legend.[89] In return, Walton demanded that Saneron vote its shares immediately rather than follow its prior plan of voting the shares at the annual meeting.[90] Kuzmin–Nichols made a special trip into Saneron's office that Sunday afternoon just to vote the shares.[91] After Kuzmin–Nichols voted the Saneron shares, Walton emailed Filipowski that "we just locked up Saneron."[92]

The parties dispute whether Saneron's vote was improperly influenced by Walton. I have no difficulty in finding that Saneron's vote was influenced by Cryo–Cell's decision to withhold both cooperation on the companies' joint projects and the counsel opinion lifting the restriction on Saneron's shares. The defendants argue that Saneron was never going to vote for the Portnoy Slate because Sanberg was unimpressed by the Portnoy Slate. In this as in other respects, the defendant's disparagement of the Portnoy Slate casts a mirrored reflection of ineptitude on the Management Slate because it is very clear that Walton, whose board controlled 38% of Saneron, genuinely feared that Saneron would vote for the Portnoy Slate. Walton's fear that Saneron would not go her way was supported by Saneron's own expressed desire to wait until the meeting day to make its final decision. Sanberg claims to have favored the Management Slate because Portnoy did not know anything about Saneron when he called to solicit Sanberg and because the Portnoy Slate did not include any scientists.[93]

**83.** Tr. at 401–02.

**84.** Kuzmin–Nichols Dep. at 22.

**85.** Tr. at 407–08.

**86.** JX 212.

**87.** Tr. at 408.

**88.** JX 219.

**89.** JX 219.

**90.** Tr. at 409–10.

**91.** Kuzmin–Nichols Dep. at 44–46.

**92.** JX 218.

**93.** Sandberg Dep. at 8.

Those after-the-fact explanations are contrary to Saneron's desire to wait until the annual meeting to vote its shares and are at odds with Walton's clear discomfort over Saneron's refusal to commit to vote for her slate.

In concluding that Saneron's voting decision was influenced by Walton's combination of threats and inducements, I acknowledge that Sanberg, Kuzmin–Nichols, and Bernard Skerkowski of Saneron have testified otherwise.[94] But that is, of course, unsurprising. Cryo–Cell owns 38% of Saneron and it is not to be expected that its executives would suggest that Saneron's vote was in essence paid for by a removal of a restrictive legend and the necessity of obtaining Cryo–Cell management's cooperation in projects vital to Saneron. The objective facts, in my view, support the conclusion that Saneron did not commit to vote for the Management Slate until the counsel opinion authorizing the removal of the restrictive legend was issued and after it was made clear that if Saneron voted no and the Management Slate won, the likelihood of future strategic relations between the companies would have been rendered much more doubtful.

### I. The Apollo Shares

During the time leading up to the Cryo–Cell annual meeting, Apollo Capital owned approximately 323,000 shares of Cryo–Cell stock (almost 3% of the shares outstanding). Kyle Krueger, Apollo's decision maker with respect to the Cryo–Cell shares, was the subject of an intense lobbying effort in the days preceding the annual meeting. On July 13, Walton and

Taymans had an hour-long discussion with Krueger in an attempt to convince him to vote in favor of the Management Slate.[95] As part of that discussion, Krueger asked Walton to have Filipowski contact him. Walton arranged for Filipowski to speak with Krueger that Friday afternoon, and after that conversation Krueger voted his shares in favor of the Management Slate.[96]

The following day, Saturday, July 14, Krueger emailed Portnoy to let him know that he had decided to vote for the Management Slate.[97] Portnoy, who had been in contact with Krueger since February, did not give up on soliciting Krueger's vote. He emailed Krueger asking him to reassess his vote and consider calling some of Cryo–Cell's former employees to find out more about "the reality of the situation" at Cryo–Cell.[98] Portnoy also contacted Susan Archibald, a former Cryo–Cell employee with whom he had been in contact since February, and asked her to call Krueger. Archibald called Krueger on Sunday, July 15, and answered the questions Krueger had about Cryo–Cell.[99] After Archibald spoke to Krueger, Krueger changed Apollo's vote to favor the Portnoy Group.[100]

### J. The Annual Meeting

The Management Slate was greeted with surprising and unpleasant news on the morning of July 16, the day of the annual meeting. Walton learned that the Apollo shares that she thought had been voted in favor of the Management Slate had flipped in favor of the Portnoy Slate. She and Roszak then changed course and

---

**94.** Sanberg Dep. at 14–15; Kuzmin–Nichols Dep. at 54; Skerkowski Dep. at 18–19.

**95.** Tr. at 369–70.

**96.** JX 202; JX 203.

**97.** JX 193.

**98.** JX 193.

**99.** Archibald Dep. at 133.

**100.** Tr. at 56.

Roszak set out to buy the Apollo shares for Filipowski. Roszak purchased the Apollo shares for SilkRoad Equity sometime before the 11 a.m. start to the annual meeting.[101] As part of that transaction, Krueger agreed to switch the vote attached to the Apollo shares from the Portnoy Slate to the Management Slate. But it would take time for the change to be processed.

Even more important than the Apollo shares was the news that Choi had withheld giving his proxy as to three of the members of the Management Slate. Walton called Choi at around 9 a.m., two hours before the start of the annual meeting, to ask why he had withheld his proxy as to those candidates. Choi explained that he "thought that by withholding votes for three of the Cryo–Cell directors that I would be able to create vacancies to effectively fill them with my own candidates, my own nominees." [102] Walton informed Choi that rather than creating vacancies for Choi's own nominees, his decision to withhold his proxy as to certain Management Slate candidates would likely result in a split slate of directors.[103] Choi then asked Walton how he could fix his "mistake." [104] Walton put Choi in touch with Chris Hayden, Cryo–Cell's proxy solicitor, who explained the process for switching the votes, and Choi set to work changing his votes. Hayden informed Walton that it "could take us quite a while to fix Mr. Choi's mistake," especially the votes for the approximately 135,000 shares held at Charles Schwab.[105]

As the time for the 11 a.m. annual meeting approached, Walton knew that the outcome of the election was uncertain and that the Management Slate needed time for the Choi votes to be switched. The Management Slate also needed time for the votes attached to the Apollo shares Roszak was acquiring to be switched.[106]

The agenda for the annual meeting called for the following items: (i) welcome and meeting procedures; (ii) the election of directors; (iii) the ratification of the appointment of independent registered accountants; (iii) consideration of a shareholder proposal; (iv) a presentation by Walton; and (v) general shareholder questions.[107] On July 13, the Friday before the annual meeting, the Portnoy Slate agreed to the rules of conduct proposed by Cryo–Cell's counsel.[108] Those rules included the rule that "the Chairman has the authority to decide all procedural issues regarding the conduct of the meeting, including ad-

---

**101.** Roszak Dep. at 130. The transaction between Roszak and Krueger was agreed to on July 16 and Krueger processed the change in the votes based on Roszak's word that they had a deal at $3 per share. Roszak Dep. at 133. Roszak, however, did not close the transaction until July 31. Rosak Dep. at 150. The reason for the delay was that the Cryo–Cell stock price dropped materially after the election and Roszak was trying to see if he could negotiate a better deal with Krueger. Roszak Dep. at 150–51. Roszak only closed the deal at $3 per share after Krueger sent an email stating that Roszak "procured [his] vote by fraud" and that he was "going to seek reversal of [his] vote." Roszak Dep. at 163.

**102.** Tr. at 357–58.

**103.** Tr. at 357.

**104.** Tr. at 358.

**105.** Tr. at 359.

**106.** Walton claims she did not know until late afternoon that Roszak—her collaborator in the vote acquisition plan—had forged a deal to buy those shares that very morning. I find that denial incredible.

**107.** JX 228.

**108.** JX 197.

journment."[109] But Portnoy's counsel warned in an email sent to Cryo–Cell's counsel early the morning of the annual meeting, that the Chairman's procedural authority, regardless of the agreement between the competing slates, "must be exercised in accordance with the By-laws of the company, and may not be arbitrary or capricious."[110] That belated attempt to add to the prior agreement on the rules of conduct never was communicated to Walton before the start of the annual meeting.[111]

The annual meeting started at 11 a.m. with a welcome and an explanation of the agenda and the rules of conduct. The meeting then proceeded as would be expected, with Portnoy introducing the Portnoy Slate, Walton introducing the Management Slate, and the polls opening for the election of directors. The ratification of auditors and the shareholder proposal were also introduced and the polls opened on those issues. Walton provided the stockholders with the opportunity to ask questions and have them answered by both her and Portnoy. Several Cryo–Cell stockholders, including Dan Richard, asked numerous questions. After the stockholder questions subsided, Portnoy attempted to introduce a motion to close the polls.[112] The time was approximately 12:30 p.m. and all the agenda items had been addressed.[113] Walton responded to Portnoy by ruling him "out of order."[114] Walton "ruled [Portnoy] out of order because [she] wanted the polls to remain open."[115] She admits, however, that while keeping the polls open was what she wanted to achieve, that is not what she explained to the Cryo–Cell stockholders.[116]

After rejecting Portnoy's motion to close the polls, Walton deviated from the agenda. She "decided at the meeting on the spot" to have Allickson, Cryo–Cell's Vice President of Research and Development and Laboratory Operations, give an unscheduled presentation on Cryo–Cell's research and development.[117] After Allickson's presentation concluded at approximately 1 p.m., Portnoy again attempted to move to close the polls.[118] Walton's response was the same as before—ruling Portnoy "out of order" without providing any information about what that meant or explaining that she was using her procedural authority to keep the polls open. Walton then had Rob Doll, Cryo–Cell's Vice President of Corporate Marketing, Sales & Services, give an impromptu presentation on Cryo–Cell's sales. The Allickson and Doll presentations took over an hour in total.[119]

After Doll's presentation and at some time between 1:30 p.m. and 2:00 p.m., Walton declared that there would be a "break for lunch" until 4:45 p.m. and that the polls would remain open during that break.[120] The issues of the exact time that Walton announced there would be a break in the meeting, the exact words she used in making that announcement, and whether that

109. JX 228.

110. JX 240.

111. Tr. at 361.

112. Tr. at 9.

113. Tr. at 8–9.

114. Tr. at 365.

115. Tr. at 365.

116. Tr. at 365.

117. Tr. at 447.

118. Tr. at 9–10.

119. Tr. at 302.

120. Tr. at 366–67.

break was an "adjournment" of the meeting are highly contested. What is uncontroverted is that Walton was not forthright with the Cryo–Cell stockholders in announcing the purpose for the break. The defendants, speaking through the testimony of defendant Christian and their pretrial brief, attempted to justify the break as a response to several requests for a lunch by stockholders, including Mark Portnoy, the fact that the meeting had run through the normal lunch hour, and, Christian's determination that the meeting "obviously wasn't going to conclude very soon." [121] Christian buttressed his conclusion that the meeting was not going to end soon with testimony that stockholders were still asking questions as of the break. [122] Later, Christian had to acknowledge that he had no direct knowledge of why Walton decided a lunch break was necessary and that his direct testimony had misrepresented what was occurring at the meeting just before the break. [123]

As a matter of fact, I conclude that Walton was stalling for time, seeking to ensure not only that the Choi and Apollo votes had been switched, but to troll for even more votes, not sure that those blocs would suffice to prevail. Mark Portnoy's request for food was a request for food to be brought in rather than to stop the meeting for a lunch break. In any event, that request was made more than an hour before Walton decided that a three-hour, mid-afternoon lunch was appropriate. [124] Moreover, Christian admitted that stockholder questions had ceased before the

unplanned (and I find intentionally filibustering) presentations by Allickson and Doll. [125] When pressed, Walton admitted the "real reason" for the break was to make sure that Choi's votes had been switched and that absent the issue with Choi's votes, she probably would not have taken a break. [126]

During the break, Walton was not just waiting for the changes in Choi's and Apollo's votes to be processed—she was actively soliciting votes and continuing her matchmaking plan. For example, Walton had Irene Smith, her executive assistant, give Charles Northcutt, a Cryo–Cell stockholder who had the proxies for approximately 100,000 shares, her business card with Roszak's name and phone number written on its face. [127]

By the end of the break, the vote changes that Walton was waiting for had been processed. As Hayden had anticipated, the votes for the non-Schwab Choi shares were changed relatively quickly, with the changes having been processed by the 11:16 a.m. voting report from Broadridge (formerly ADP). [128] At the time of that Broadridge report, proxies for the Choi shares held at Charles Schwab were still withheld for three directors. In addition, that report showed the Apollo shares were still voted in favor of the Portnoy Slate. The next Broadridge report, which showed the reversal of the Choi withholds for the Schwab shares and the change in the vote for the Apollo shares, was not issued until 3:41 p.m. [129] Thus, the exact

**121.** Tr. at 258, 299–300; Def. Op. Pre–Trial Br. at 28–29.

**122.** Tr. at 262.

**123.** Tr. at 297–98, 301–02.

**124.** Mark Portnoy Dep. at 25.

**125.** Tr. at 302.

**126.** Tr. at 367, 448.

**127.** Smith Dep. at 36–39; Northcutt Dep. at 13, 27; JX 284.

**128.** JX 230; Tr. at 191.

**129.** JX 237; Tr. at 98–100.

time at which the votes for the Schwab and Apollo shares changed cannot be identified. Hayden suggests that that the change of the votes for the Schwab shares was processed by approximately 1:55 p.m.[130] Neither Hayden nor Paul Schulman, the Portnoy Slate's proxy solicitor, could estimate the time the change of the votes for the Apollo shares was processed.[131]

At 4:45 p.m., having received the 3:41 p.m. Broadridge report and now knowing that the Management Slate held a lead of approximately 600,000 votes, Walton reconvened the meeting.[132] Walton asked if any stockholders who wanted to vote had not voted, and when no stockholders indicated that they still needed an opportunity to vote, Walton quickly closed the polls.[133] The entire post-break activities took approximately five minutes.[134]

The six-hour length of the annual meeting, primarily due to the three-hour lunch break and the approximately one hour of impromptu presentations by Allickson and Doll, was surprising. Cryo–Cell's annual meeting typically only lasted one hour, and the hotel conference room where the annual meeting took place was only reserved until 1 p.m.[135] Cryo–Cell's own proxy solicitor, Hayden, was scheduled on a flight leaving at 2:10 p.m. from Tampa.[136]

Even after the close of the extended annual meeting, the day was not over for Cryo–Cell's stockholders. Only minutes after the annual meeting ended, Cryo–Cell

filed its 10–Q with the SEC.[137] That document disclosed that Cryo–Cell lost $1.4 million in the previous quarter.[138] The market's response following the annual meeting and the 10–Q was not positive— Cryo-Cell stock dropped from a close of $2.35 per share on July 16 to $1.48 per share on July 31.[139]

### K. *The Results Of The Election*

On July 31, the Inspectors of Election issued their final report, showing that all six directors on the Management Slate had prevailed in the proxy contest.[140] After adjusting the election results for approximately 30,000 shares that the parties have stipulated were improperly recorded for the Management Slate, the Management Slate candidate with the most votes exceeded the Portnoy Slate candidate with the least votes by 613,977 votes.[141]

### L. *The Second Filipowski Group Board Seat*

After it became clear that the Management Slate had prevailed, Walton and the board immediately began to follow through on their agreement to give the Filipowski Group an additional board seat. On August 2, 2007, Walton emailed Cryo–Cell's counsel about a phone call she had with Roszak about the promised board seat: "Roszak called today and among other matters indicated that [Filipowski] had chosen him to fill *their* second board

**130.** Tr. at 193.

**131.** Tr. at 99–100, 220–221.

**132.** Tr. at 104–05, 450.

**133.** Tr. at 368–69.

**134.** Tr. at 222.

**135.** Tr. at 430.

**136.** Tr. at 222–23.

**137.** Tr. at 450–51; JX 234.

**138.** JX 234 at 5.

**139.** JX 290.

**140.** JX 275.

**141.** Stip. Facts 23–24.

seat." [142] That email also contained a fig leaf designed to suggest that this was not a sealed deal: "I asked [Roszak] to e-mail me his profile along with one or two other potential candidates, recognizing that the board is obligated to conduct our established process for consideration and due diligence review of nominees. He agreed to provide. [Counsel for the board], please add the background check for Roszak to the project." [143] I view those statements as just what I said, a fig leaf to conceal the prior deal, especially from counsel.

Carrying out their side of this game of creating a good appearance, the Filipowski Group filed an amendment to its Schedule 13D on August 3, 2007. That amendment disclosed that "[p]ursuant to its discussions with management, SilkRoad Equity intends to seek to put a person on the Board of Directors of the Company." [144] That same day, Roszak also emailed Walton three profiles for prospective board candidates, including his own, and asked Walton to "[p]lease let [him] know what our next steps are in this regard." [145] Walton responded to Roszak's email with the following: "Thanks for your follow-up. I'll get things rolling on this with [counsel for the board] and the board. I'll keep you posted as we progress. Please note that the BOD dinner is on 9/26 and the meeting itself is on 9/27—two dates to reserve. More to follow." [146] The process of adding Roszak to the board was halted, however, with the filing of the complaint in this action on that same Friday, August 3, 2007.

The defendants claim that the exchange of emails above does not indicate that the Filipowski Group had been promised a second board seat. Instead, Walton argues that her email to Cryo–Cell's counsel about "their second board seat" only "referr[ed] to the fact that counsel knew that Mr. Roszak and Mr. Filipowski had requested a second board seat." [147] Walton claims that her later email to Roszak about the dates of the next board dinner and meeting was not sent to Roszak because he was being added to the board but rather to inform Filipowski of the dates. Walton alleges that Roszak was Filipowski's "chief administrator" and sending him information for Filipowski was not unusual. [148] Walton's alternate after-the-fact explanation is that she was informing Roszak that the governance committee, which was not mentioned in the email, would be meeting on that date and that it might be a possible date for that committee to interview Roszak. [149] I find that the email to counsel about "their second board seat" and the email to Roszak about the dates of the upcoming board events, when combined with facts described above about Roszak's request for a second board seat, support my conclusion that Walton had promised the Filipowski Group a second board seat before the election.

The defendants' explanations of the Walton's emails are, candidly, implausible. Sadly, that is consistent with a good deal of the defendants' testimony. The defendants, rather than coming into court and honestly explaining what occurred in the heat of a close proxy contest, presented me with numerous half-truths and implausible tales. Defendant Christian, for example,

**142.** JX 279 (emphasis added).

**143.** JX 279.

**144.** JX 278.

**145.** JX 280.

**146.** JX 281.

**147.** Tr. at 466–67.

**148.** Tr. at 460–61.

**149.** Tr. at 466.

implausibly said that the proxy contest had nothing to do with adding Filipowski to the Management Slate. He also claimed to have knowledge of the reasons for the decision to take a lunch break at the annual meeting when he had no role in making that decision. Moreover, Christian gave misleading and then retracted testimony about whether stockholders were asking questions immediately before the lunch break. Walton, who sat through Christian's misleading testimony and saw the truth come out on cross-examination, was undeterred from making implausible assertions. Her claim that the email about "their second board seat" does not mean what it plainly says is unbelievable. Equally as implausible is her claim that her reply email to Roszak about the dates of the next board events, which did not copy or even reference Filipowski and was clearly made in the context of an email chain discussing adding Roszak to the board, was merely intended to give notice to Filipowski about those events. Perhaps, in an odd way, the best argument in favor of Walton's improbable explanations that her emails really mean something different than what they seem to plainly state is that whether giving testimony in court or explaining to Cryo–Cell's stockholders why she was declaring a break in the annual meeting, Walton has been consistent in making statements that differ from what I perceive to be the underlying realities of the situation.

## II. *The Merits Of Portnoy's Claims*

Portnoy has brought this claim under 8 *Del. C.* § 225 challenging the seating of the Management Slate. He claims that the election results should be overturned because the Management Slate would not have been elected had the following alleged breaches of duty not occurred:

1) A supposedly improper agreement by the Cryo–Cell board to include Fili-powski on the Management Slate, not because they believed that was in the best interests of Cryo–Cell and its stockholders, but merely as consideration for Filipowski's agreement to vote for the incumbent board members in the proxy fight;

2) A supposedly improper promise by Walton that the incumbent board members would, if re-elected, add another Filipowski designee, Roszak, to the board if Filipowski continued to buy up more shares and if that conduct resulted in the Management Slate winning the election;

3) A course of conduct by Walton employing both threats and an inducement to influence Saneron to cast its vote for the Management Slate;

4) An adjournment of the annual meeting without a vote of the Cryo–Cell stockholders as Portnoy contends was required by the corporation's by-laws, and, in any event, an inequitably motivated and falsely justified "lunch break" that was designed to give the Management Slate more time to gather votes because they feared defeat if the vote was counted in accordance with the original schedule.

As a remedy for these supposed breaches, Portnoy argues that I should simply seat his Slate because, but for these breaches, they would have prevailed. He also seeks reimbursement for his fees and expenses, not only in the proxy fight, but in this litigation.

For their part, the defendants contend that they at all times acted properly. As they see it, all of their conduct was fair. They vehemently deny most of Portnoy's factual allegations, but then alternatively argue that even if they did what he alleges, no remedy should ensue. Proxy fights are

full of rough and tumble, in their estimation, and the fact that their side's elbows were sharper is no basis to upset the election results. As a backstop, the defendants argue that I should deny Portnoy any right to contest the election because they view his communications with a former Cryo–Cell employee bound by a confidentiality agreement during the proxy fight to be inequitable behavior disqualifying him from equitable relief.

I begin my consideration of these arguments, with Portnoy's claims regarding the relationship between the incumbent board members on the Management Slate (led by Walton) and Filipowski. I then move on to briefly address the Saneron issue. I conclude with the claim related to the conduct of the meeting itself.

### A. The Addition Of Filipowski To The Management Slate

■ Portnoy claims that all aspects of the incumbents' dealings with Filipowski are tainted by fiduciary misconduct. As he sees it, the incumbents had already marked out the key characteristics they were looking for in additional board members—healthcare industry and stem cell industry experience—and that Filipowski did not have those. Walton, and a board that Portnoy rightly portrays as having every appearance of largely following her lead without much question, simply made a bargain to add Filipowski to the Management Slate, not because they thought his service would help Cryo–Cell but because it would ensure that the large bloc of votes Filipowski controlled would vote for their re-election. That is, this was an entrenchment-motivated decision. Portnoy contends that the deal struck between Walton and the other incumbents, on the one hand, and Filipowski, on the other, to add Filipowski to the Management Slate in

exchange for his support in the proxy fight constituted an illegal vote-buying arrangement.

On this claim, which has some color, I find in favor of the defendants. My conclusion rests on several grounds. Initially, I note that an arrangement of this kind fits comfortably, as a linguistic matter, within the traditional definition of so-called "vote buying" used in our jurisprudence. As defined by Vice Chancellor Hartnett in his important decision in *Schreiber v. Carney*, "[v]ote-buying ... is simply a voting agreement supported by consideration personal to the stockholder, whereby the stockholder divorces his discretionary voting power and votes as directed by the offeror." [150] In this case, I have no doubt that the voting agreement between the Filipowski Group and the incumbents was only assented to by Filipowski after he was offered a candidacy on the Management Slate. What I am more doubtful about is whether an arrangement of this kind—where the incumbents offer a potential insurgent a seat on the management slate in exchange for the potential insurgent's voting support—should trigger the sort of heightened scrutiny rightly given to more questionable arrangements.

To say that the law of corporations has struggled with how to address the subject of so-called "vote buying" is no insult to judges or corporate law scholars, the question of what inducements and agreements may legitimately be forged to cement a voting coalition is doubtless as old as the concept of a polity itself. For these very real-world reasons, *Schreiber* refused to say that any sort of arrangement involving the exchange of consideration in connection with a stockholder's agreement to vote a particular way was forbidden vote buy-

---

**150.** 447 A.2d 17, 23 (Del.Ch.1982).

ing.[151] Indeed, distinguished scholars have anguished (the adjective I take away from their work) over how to deal with such arrangements, with most concluding that flat-out prohibitions are neither workable nor of utility to diversified stockholders.[152] The absence of a per se ban on such arrangements is unsurprising for another obvious reason, voting agreements with respect to corporate stock are actually contemplated by our statutory corporate law.[153] Often such agreements have the intended effect of forming a voting coalition between stockholders that involves the requirement that the contracting parties vote to elect each other to the board.

■ To deal with these complexities, *Schreiber* declined to find that vote buying was, in the first instance, per se improper.[154] Rather, *Schreiber* articulated a two-pronged analysis.[155] In the first instance, if the plaintiff can show that the "object or purpose [of the vote buying was] to de-

fraud or in some way disenfranchise the other stockholders," the arrangement would be "illegal per se."[156] Putting this in terms that I think are truer to the way our corporate law works, what I take from this is that if the plaintiff proved that the arrangement under challenge was improperly motivated, then the arrangement would be set aside in equity, irrespective of its technical compliance with the DGCL.[157] That is, in keeping with the traditional vigilance this court has displayed in ensuring the fairness of the corporate election process, and in particular the process by which directors are elected, purposely inequitable conduct in the accumulation of voting power will not be tolerated.[158] Even when a vote buying arrangement cannot be found, in the first instance, to be motivated by a fraudulent, disenfranchising, or otherwise inequitable intent, *Schreiber* concluded that "because vote-buying is so easily susceptible of abuse it

151. *Id.* at 25–26.

152. *See, e.g.,* Thomas J. André, Jr., *A Preliminary Inquiry into the Utility of Vote Buying in the Market for Corporate Control,* 63 S. Cal. L.Rev. 533, 636 (1990); Robert Charles Clark, *Vote Buying and Corporate Law,* 29 Case W. Res. L.Rev. 776, 806–07 (1979). *But see* Frank H. Easterbrook & Daniel R. Fischel, *Voting in Corporate Law,* 26 J.L. & Econ. 395, 410–11 (1983) (arguing against allowing vote-buying agreements).

153. *See* 8 *Del. C.* § 218 (permitting voting trusts and voting agreements).

154. 447 A.2d at 25–26.

155. *Id.*

156. *Id.*

157. *See Schnell v. Chris–Craft Indus., Inc.,* 285 A.2d 437, 439 (Del.1971) (holding that "inequitable action does not become permissible simply because it is legally possible"); *see also* Adolphe A. Berle, *Corporate Powers As Powers In Trust,* 44 Harv. L.Rev. 1049, 1049

(1931) ("[I]n every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which apply in favor of a cestui que trust to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.").

158. *E.g., MM Cos. v. Liquid Audio, Inc.,* 813 A.2d 1118, 1127 (Del.2003) ("This Court and the Court of Chancery have remained assiduous in carefully reviewing any board actions designed to interfere with or impede the effective exercise of corporate democracy by shareholders, especially in an election of directors."); *Schnell,* 285 A.2d at 439 (Del. 1971); *State of Wisconsin Inv. Bd. v. Peerless Sys. Corp.,* 2000 WL 1805376, at *7 (Del.Ch. 2000); *Chesapeake Corp. v. Shore,* 771 A.2d 293, 297 (Del.Ch.2000); *Agranoff v. Miller,* 1999 WL 219650, at *11–12, *18 (Del.Ch. 1999); *Blasius Indus., Inc. v. Atlas Corp.,* 564 A.2d 651, 663 (Del.Ch.1988); *Lerman v. Diagnostic Data, Inc.,* 421 A.2d 906, 914 (Del.Ch. 1980).

must be viewed as a voidable transaction subject to a test for intrinsic fairness." [159]

Subjecting an agreement to add a potential insurgent to a management slate to the *Schreiber* intrinsic fairness test would, in my view, be an inadvisable and counterproductive precedent. If one takes a judicial standard of review seriously, as the members of this court do, the decision to subject all such arrangements to the entire fairness standard could result in creating litigable factual issues about a large number of useful compromises that result in the addition of fresh blood to management slates, new candidates who will tend to represent actual owners of equity and might therefore be more independent of management and more useful representatives of the interests of stockholders generally. I emphasize "litigable factual issues" because a judicial standard that by definition imposes on the defendants an onerous burden of persuasion is one that largely eliminates any possible use of Rule 12(b)(6) motion practice to get rid of the case. Beyond the pleading stage, it is also difficult to meet a substantive fairness standard by invoking Rule 56, because any material factual question relevant to fairness will result in the need for a trial.

In being chary about extending *Schreiber's* reach to this context, I do not underestimate the value of being included in the management slate. An offer to be on the management slate will often promise a near certainty of eventual election. At the very least, it will relieve the insurgent of having to pay for his own candidacy and to run a contested election against corporate insiders who do not have to pay their own solicitation costs. Instead, the insurgent would be on the inside track, so to speak.

But being on the inside track is different than being on the board, and that differ-ence suggests that employing an entire fairness standard to such arrangements is overkill. If the only arrangement at issue is a promise to add a potential insurgent to the management slate in exchange for the insurgent's voting support, then the arrangement is subject to stockholder policing in an obvious, but nonetheless, potent form. That policing occurs at the ballot box itself.

Here, to be specific, the Cryo–Cell stockholders went to the polls knowing that Filipowski had been added to the Management Slate. Those stockholders also knew that Filipowski had contracted to vote the Filipowski Group's shares for the Management Slate. Although it was not publicly disclosed that Filipowski's agreement to vote for the Management Slate had been conditioned on his addition to that Slate, and that the incumbents had added Filipowski to the Management Slate in exchange for his support, that inference was, I think, unmistakable to any rational stockholder. Surely it was known by Portnoy, who knew that Filipowski had been unhappy about the Company's performance, and had flirted with running a slate with Portnoy, only to secure a place for himself on the Management Slate. Therefore, Portnoy was well-positioned to point out that Filipowski had committed to support incumbents whose wisdom and fidelity to stockholders Filipowski himself had only recently called into serious question.

Given that the electorate's own opportunity to decide for itself whether Filipowski should serve, I think it unwise, as a matter of our common law, to apply the intrinsic fairness test to this situation. As Portnoy would have it, I should make a judgment about whether Walton and the other incumbents would have ever thought Filipowski a board member beneficial to

159. 447 A.2d at 25–26.

Cryo–Cell *but for* their entrenchment-motivated desire to secure his vote. I have little hesitancy in concluding that Walton was not anxious to have Filipowski on her board. She and her colleagues warmed to that idea only when confronted with the reality of almost certain defeat if Filipowski joined Portnoy in running a dissident slate, and were at great risk even if Filipowski supported the Management Slate. In other words, I have no doubt Filipowski was added to the Management Slate primarily to secure his vote. But I also have no doubt that Walton and the board determined that Filipowski was a credible candidate with some useful attributes.

■ The notion that judges should chew over the complicated calculus made by incumbent boards considering whether to add to the management slate candidates proposed by a large blockholder whose velvety suggestions were cloaking an unmistakably clenched fist seems to run against many of the sound reasons for the business judgment rule.[160] There is, thankfully, a practical and civic dynamic in much of our nation's human relations, including in commerce, by which clashes of viewpoint are addressed peaceably through give and take. When stockholders can decide for themselves whether to seat a candidate who obtained a place on a management slate by way of such bargaining, it seems unwise to formulate a standard that involves the potential for excessive and imprecise judicial involvement.[161]

In expressing concerns about overbreadth in this area, this decision echoes concerns voiced by the Supreme Court and this court about the difficulty of applying the compelling justification test articulated in *Blasius* in a manner that works sensible results.[162] But like those decisions, this decision is rooted in the premise that the *Schnell* doctrine, authorizing this court to set aside conduct that is inequitably motivated and that unfairly tilts the electoral playing field, is itself a potent tool of equity. That is, the first order review required by *Schreiber* and that suggested in this court's recent decisions in *Mercier v. Inter–Tel (Del.), Inc.*[163] and *In re MONY Group, Inc. Shareholder Litigation,*[164] which looks to the subjective motivations of the defendants is an extremely important safeguard of the stockholder voting rights whose importance were so eloquent-

---

160. *See, e.g., In re Caremark Int'l Inc. Derivative Litig.,* 698 A.2d 959, 967 (Del.Ch.1996) ("To employ a different rule—one that permitted an 'objective' evaluation of the decision— would expose directors to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests.").

161. The doctrine of ratification is not a satisfactory answer to this problem. Under our law, ratification has to be accomplished by a vote of the disinterested shares. That is, even if one assumes that the election of the nominee on the management slate by the electorate is a ratification of that nominee's placement on that slate by way of the agreement under challenge, the nominee would have to win a majority of the shares not subject to the agreement. Because the very purpose of voting alliances is to pool voting power, disqualification of those shares for these purposes would render them less effective. Here, for example, Filipowski would not have won absent the shares he and the other Management Slate members voted in his favor. That is also true for the rest of the Management Slate.

162. *See, e.g., Williams v. Geier,* 671 A.2d 1368, 1376 (Del.1996) ("*Blasius*' burden of demonstrating a 'compelling justification' is quite onerous, and is therefore applied rarely."); *Mercier v. Inter–Tel (Del.), Inc.,* 929 A.2d 786, 809–10 (Del.Ch.2007); *In re MONY Group, Inc., S'holder Litig.,* 853 A.2d 661, 674 (Del. Ch.2004); *Chesapeake,* 771 A.2d at 319–20.

163. 929 A.2d at 810.

164. 853 A.2d at 676–77.

ly articulated in *Blasius*, particularly when insiders are undertaking actions designed to aid their own efforts to retain office.[165]

The second order questions of what good faith actions affecting the voting and the election process (and which elections) trigger what form of heightened scrutiny are important and controversial. But the debate over those questions should not obscure the potency of a good old-fashioned inquiry under precedent such as *Schnell*, which proscribes conduct that is disloyal in the well-understood sense that it was undertaken not to advance corporate interests, but to entrench managers in office.[166]

▇ In my view, a mere offer of a position on a management slate should not be considered a vote-buying arrangement subject to a test of entire fairness, and for that reason, I see no reason to condemn the addition of Filipowski to the Management Slate.[167] As an alternative matter, the defendants have convinced me that there was nothing unfair about joining forces with Filipowski in this manner. In this regard, I note that there is not a hint that Filipowski sought to receive financial payments from Cryo–Cell in the form of contracts or consulting fees or other such arrangements. What he sought was influence on the board of a company in which

---

**165.** *See Inter–Tel,* 929 A.2d at 807 ("Because there is a burden on the party in power to identify its legitimate objectives and to explain its actions as necessary to advance those objections, flimsy pretense stands a greater chance of being revealed.").

**166.** *See Cede & Co. v. Technicolor, Inc. ("Cede II"),* 634 A.2d 345, 363 (Del.1993) (stating that action taken for the purpose of entrenchment is disloyal).

**167.** In expressing concerns about subjecting the addition of a candidate to a management slate to a fairness test, I also acknowledge that the recent decision in *Inter–Tel* articulating a method for addressing behavior influencing the conduct of a corporate election resembles the *Schreiber* test in important ways. That decision applied, consistent with *Unocal,* a two-part review. *Inter–Tel,* 929 A.2d at 810–11 (referencing *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946 (Del.1985)). In the first instance, that review required the directors to show that their election-directed conduct was motivated by "a legitimate corporate objective." *Id.* at 810. That is, as a minimum, the directors had to show that they acted in good faith to advance proper corporate, not personal interests. *Id.* ("[T]he directors should bear the burden of persuasion to show that their motivations were proper and not selfish."). Even if they made that showing, they then had to demonstrate that their actions were reasonable, in the sense that they did not have the effect of precluding the stockholders from voting contrary to management's wishes or coercing the stockholders in their voting calculus. *Id.* at 810–11.

As with the *Schreiber* test, the first layer of the test remains focused where it should, on the question of whether the actions of the defendants were well-motivated, i.e., a straightforward *Schnell* inquiry. Applied to actions like that of adding someone to the management slate (rather than say, how an election was conducted), that first layer is difficult to apply because if the defendants believed in good faith that their continued board service is useful to stockholders and that the new addition to the management slate will help in the election process and be a credible director, then condemning their decision without some other troubling effect or evidence would have the effect of chilling voluntary solutions to stockholder unrest.

The second-stage of the *Inter–Tel* standard would be advantageous, because it would likely be less litigation-intensive and judicially-intrusive to consider the objective effect of an arrangement of this kind. Because such arrangements would rarely, one thinks, preclude stockholders from electing someone else or coerce them out of doing so, use of a standard of this kind would provide more possibility for low-cost resolution of weak claims, while still requiring defendants to survive review under a plaintiff-friendly standard of review. In so suggesting, I confess to believing it awkward and not particularly useful for a judge to inquire into whether it was "entirely fair" for incumbent directors to add a certain person to a management slate in exchange for her voting support.

he owned a large number of shares, an ownership interest that gave him an incentive to increase the company's value. Stockholders knew he sought a seat and he had to obtain their votes to get on the board.

For all these reasons, I conclude that Portnoy's attack on this aspect of the incumbents' dealings with Filipowski fails.

### B. *The Promise Of A Second Board Seat For The Filipowski Group*

■ I reach a different conclusion, however, about the later arrangement that was reached with Filipowski shortly before the annual meeting. As I found previously, Walton (acting at the very least with the apparent authority of her board colleagues, who were extremely deferential to her leadership) promised Filipowski that if the Management Slate won, the incumbent board majority would use its powers under the Company's bylaws to expand the Cryo–Cell board from six members to seven and to fill the new seat with Filipowski's designee, Roszak. That promise was made in response to Roszak's request—as Filipowski's negotiator—and made in exchange for Filipowski's promise to go out and buy more shares (and therefore votes).

Although the defendants deny that this deal was made, I find their denial lacking in credibility. I also have no doubt that Walton had sufficient dominion over the Cryo–Cell board to deliver on the deal and that she and her fellow incumbents would have placed Roszak on the board had not this suit by Portnoy intervened and made that inadvisable, from a litigation and perceptual standpoint.

I believe that this arrangement differed in materially important respects from the prior agreement to place Filipowski on the Management Slate. For starters, Walton did not merely promise someone a shot at getting elected by the stockholders by running in the advantaged posture of being a member of a management slate. She promised that she and her incumbent colleagues would use their powers as directors of Cryo–Cell to increase the size of the board and seat Roszak. This was therefore a promise that would not be, for the duration of the term, subject to prior approval by the electorate.

In noting this difference, however, I wish to be mindful of the continuing relevance of the color grey. As is well known, it is hardly unusual for boards to address the concerns of unsettled stockholders by using their powers to fill a vacancy (whether newly created or pre-existing) with a director suggested by the stockholders. Indeed, many stockholder advocates believe that developments of this kind should be more common. There is therefore some non-trivial basis to be concerned about labeling such arrangements as vote buying arrangements subject to *Schreiber,* or as inequitable under *Schnell,* even if the incumbents' motivations for the arrangements include (as they almost always will) a desire to remain in office.

In voicing this concern, I recognize that there is a rather obvious retort, which is that incumbents should not be adding new candidates only on the condition that those who suggest them agree to vote for the management slate at the next election. But if one is going to address the issue maturely—in the sense of actually realistically considering the human, business, and practical considerations that motivate pragmatic settlements of difficult problems—then that is no answer at all. From the subjective view of the incumbents, one of the benefits they are accomplishing by a settlement of that kind is to protect the company from the distraction of a costly and fractious battle over control. The incumbents may well believe, in good faith, that their continuance in office is best for

the stockholders. They may prefer not to add members to the board but may come to believe that, on balance, it would better serve the interests of stockholders to add new representation at the instance of vocal stockholders and avoid a high-stakes fight for control than to be confrontational. In that circumstance, though, it seems logical that the incumbent board majority might well, and with entire fidelity, expect that the stockholders who asked for new representation commit in exchange to support the newly composed board at the next election, if not for some longer period of service. Absent such an agreement, no appreciable period of peace would be secured during which the newly composed board could focus on simply making the business hum.

In view of these concerns, I am chary about addressing the promise of a second board seat that was made to Filipowski on broader grounds than is necessary. For me, there is a very clear and important, but narrow, reason why this later arrangement with Filipowski was improper and inequitably tainted the election process: it was a very material event that was not disclosed to the Cryo–Cell stockholders.

■ "[D]irectors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." [168] That disclosure "obligation attaches to proxy statements and any other disclosures in contemplation of stockholder action." [169] "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." [170]

On the day they voted, the Cryo–Cell stockholders knew that a vote for the Management Slate would seat six directors, including Filipowski. They had to know that Filipowski's support for the Management Slate was in large measure motivated by his own inclusion.

What the Cryo–Cell stockholders did not know was that Walton had promised that the board would use its fiduciary powers to expand the board to seven members and seat another person designated by Filipowski. Problematically, the Cryo–Cell stockholders did not know that Filipowski clearly intended to designate Roszak, a person whose recent past would have weighed heavily on the mind of a rational stockholder considering whether to seat him as a fiduciary. Indeed, at trial, the defendants went out of their way to say that they decided to include Filipowski only after concluding that Roszak's conduct in the Blue Rhino situation did not cast doubt on *Filipowski's* own good character.

In so concluding, I do not hesitate to note my belief that Walton knew that Roszak was going to be Filipowski's designee before the meeting, but also that my ultimate conclusion that this was a material agreement that should have been disclosed would not change if that was not so. Stockholders would have found it material to know that corporate management's cooperation with Filipowski had now extended to a bargain whereby he would buy up more shares and votes in exchange for having two seats on the board. A reasonable stockholder could have come to the conclusion that they did not want Filipow-

---

**168.** *Arnold v. Soc'y for Savings Bancorp., Inc.,* 650 A.2d 1270, 1277 (Del.1994) (quoting *Stroud v. Grace,* 606 A.2d 75, 84 (Del.1992)).

**169.** *Id.*

**170.** *Zirn v. VLI Corp.,* 621 A.2d 773, 778 (Del. 1993) (quoting *TSC Indus. v. Northway,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

ski to have so much influence—and certainly not if Roszak, his employee with a dubious track record, was going to be his guaranteed echo on the board.

In this regard, it is worth observing that even those academic commentators who have endeavored to justify tolerance of forms of vote buying as having benefits to diversified investors have emphasized the need for fair disclosure of such arrangements.[171] For reasons I have described, it is prudent not to jump too quickly to the conclusion that voting pacts of this kind should automatically be seen as inequitable, although one could do so and find credible support for such a finding.[172] For many of the reasons that supported my earlier decision regarding Filipowski's inclusion on the Management Slate, an agreement of this kind that was made and disclosed in advance of an election is subject to the important fairness check of the stockholder vote itself. By contrast, the disinterested Cryo–Cell electorate voted in ignorance of the actual board that would govern them in the event the Management Slate won.

This finding is not affected by the defendants' argument that all stockholders were free to go out and acquire shares with voting rights before the polls closed and that that was all that Filipowski did. Well no, it wasn't. He went out and bought more shares only on the promise that the incumbents would appoint another designee of his to the board. What Filipowski did with his own bought shares is less the point than that the disinterested electorate voted in a razor-thin election without knowledge of very material facts. Absent that deal, the Management Slate would have lost. If the deal was disclosed, it might well have lost due to the reaction of unaffiliated stockholders to the deal itself.

### C. Management's Influence Over Saneron's Vote

Because of my conclusions regarding the Filipowski issues, I need not dwell at length on the Saneron bloc. Even absent Walton's conduct toward Saneron, I would set aside the election results.

In my view, threats and promises of the kind directed at Saneron are much less problematically dealt within the *Schreiber* framework than properly disclosed agreements that involve give-and-take about the shape of a board slate. When what an agreement involves is not an accommodation about board service itself, but the use

---

171. *See* Thomas J. André, Jr., *A Preliminary Inquiry into the Utility of Vote Buying in the Market for Corporate Control*, 63 S. Cal. L.Rev. 533, 625 (1990) (observing that disclosure is a constraint on the agency costs that might result from vote buying by management); Robert Charles Clark, *Vote Buying and Corporate Law*, 29 Case W. Res. L.Rev. 776, 799 (1979) (suggesting that disclosure of vote-buying arrangements provides protection against looters); *cf. Schreiber*, 447 A.2d at 26 ("[T]he subsequent ratification of the [vote-buying] transaction by a majority of the independent stockholders, *after a full disclosure of all germane facts with complete candor* precludes any further judicial inquiry of it.") (emphasis added); Henry T.C. Hu & Bernard Black, *The New Vote Buying: Empty Voting and Hidden (Morphable) Ownership*, 79 S. Cal. L.Rev. 811,

877 (2006) ("The history of ownership disclosure suggests that, precise thresholds and delay periods aside, our society will not tolerate hidden control of major companies, nor control contests waged behind closed doors. So disclosure of major positions there will be.").

172. *See* Restatement of Contracts § 569 (1932) ("A bargain by an official or shareholder of a corporation for a consideration enuring to him personally to exercise or promise to exercise his powers in the management of the corporation in a particular way is illegal."); *see also* N.Y. Bus. Corp. Law § 609(e) (McKinney 2003) (stating that a "shareholder shall not sell his vote or issue a proxy to vote to any person for any sum of money or anything of value").

of a corporate asset (such as a contractual concession) by the management slate to secure a vote for itself, it is much more natural to consider that agreement "vote buying" in the traditional sense and to employ *Schreiber's* back-stop fairness analysis. For the following reasons, I find that the defendants fail both the prong requiring Walton's actions to have been motivated by a good faith desire to advance corporate interests, rather than to entrench herself, and the prong requiring the defendants, even if Walton had acted in good faith, to justify their dealings with Saneron as entirely fair to Cryo–Cell.[173]

■ I begin with my conclusion that Walton breached her fiduciary duties by intentionally using corporate assets to coerce Saneron in the exercise of its voting rights. As I have found, Walton both threatened Saneron (with the loss or at least cooling of a strategic partnership vital to it) and granted it an inducement (the lifting of a restrictive legend on its shares) in order to extract a commitment from Saneron to vote for the Management Slate.

There is no doubt that threatening Saneron was improper conduct by Walton, whereby she used her power as a fiduciary to control assets of Cryo–Cell for the purpose of entrenching herself in office. I, of course, do not rest my conclusion on a finding that Saneron formally agreed to vote for the Management Slate in response to Walton's inducements and threats. As Chancellor Chandler observed in his important decision in *Hewlett–Packard*, it would be naïve to expect that dealings of this kind would manifest themselves in a formal contract.[174] Just as was the case

with her dealings with Filipowski, Walton's dealings with Saneron were conducted in a different vernacular than that of executed contracts, but one that was just as easy, or even easier, to understand.

*Hewlett–Packard* recognized that management controls powerful tools that, if misused for entrenchment purposes, can inequitably tilt the election process. For that reason, Chancellor Chandler held a trial to determine whether the CEO of Hewlett–Packard had put pressure on a key stockholder to vote in favor of management on a merger by implying that the stockholder, which had important commercial relationships with Hewlett–Packard, would not get future business if it voted against management's favored position.[175] He rejected that claim only after a searching factual inquiry into whether such pressure had been exerted and after concluding that it had not.[176] In his earlier decision concluding that a trial was necessary, he stated:

> Shareholders are free to do whatever they want with their votes, including selling them to the highest bidder. Management, on the other hand, may not use corporate assets to buy votes in a hotly contested proxy contest about an extraordinary transaction that would significantly transform the corporation, unless it can be demonstrated, as it was in *Schreiber*, that management's vote-buying activity does not have a deleterious effect on the corporate franchise.[177]

Chancellor Chandler's serious concerns about overreaching of this kind is understandable. As a practical matter, it is to be expected that stockholders who have ongoing commercial relationships with the

---

**173.** *Schreiber,* 447 A.2d at 25–26.

**174.** *See Hewlett v. Hewlett–Packard Co.,* 2002 WL 549137, at *4 (Del.Ch.2002).

**175.** *Id.* at *3, *5.

**176.** *Hewlett v. Hewlett–Packard Co.,* 2002 WL 818091, at *15 (Del.Ch.2002).

**177.** 2002 WL 549137, at *4.

corporation are likely to fear crossing management. When management asks for the vote of such a stockholder by appealing to the stockholder at its highest level of authority in a hotly contested, high-stakes situation, the very act of asking can be perceived as carrying with it the idea that the stockholder's answer will have implications for the future relationship of the stockholder and the corporation, on all levels.

Therefore, what is perhaps most surprising about the Saneron situation is that the Saneron vote was in such serious doubt that Walton felt the need to and did apply overt pressure on Saneron. Clearly, Saneron's leadership was frightened of being on the wrong side of a proxy fight, at a company that controlled 38% of its own shares. It was afraid of tilting either way. Although Walton would now have me believe that her instructions to her subordinates to end cooperation with Saneron until Saneron committed to vote for the Management Slate should simply be seen as Nixonian ramblings her staff was wise enough to ignore, I don't believe that was the case. Rather, I believe that Walton and her aides did what was found not to have occurred in *Hewlett–Packard*, which was to use the threat that a vote contrary to management's wishes would injure a stockholder's commercial relationship with the corporation in order to extract its vote.[178] And, as I noted previously, to expect that Saneron would admit after the fact that Walton's improper behavior influ-

enced its vote is unrealistic, given the very reasons that gave Walton leverage over it in this first instance.

Given that Walton clearly used company resources to coerce Saneron in the voting process and thereby breached her duty of loyalty, it was the defendants' burden to show that Saneron's vote was not influenced by her misbehavior.[179] They have not convinced me of that at all. Rather, the circumstances surrounding Saneron's decision to vote for the Management Slate are more consistent with a bargained-for exchange, in which Saneron got a removal of the restrictive legend and the hope of future cooperation from Cryo–Cell in exchange for casting an early and important vote for the Management Slate. Walton's own words regarding the effect of her tactics said it best: those tactics "locked up" Saneron's vote.[180]

In concluding that Walton's conduct was improper, it is relevant that Cryo–Cell had refused to remove the restrictive legend from Saneron's shares for two years. One has to presume that the refusal was properly motivated by Cryo–Cell's best interests and legal rights. For Walton to relent in exchange for a vote for the Management Slate involved the conversion of a corporate asset into a tool of personal entrenchment. Likewise, there is no reason to believe that Saneron had any motive to misuse its strategic relationship with Cryo–Cell so as to injure Cryo–Cell as a corporation and advantage itself. Making

178. *Hewlett*, 2002 WL 818091, at *15.

179. *See In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *1159 (Del.Ch.1989) (When "a director ... place[s] his own interests, preferences or appetites before the welfare of the corporation" it is "apparent that such a director would be required to demonstrate that the corporation had not been injured ...."); *see also Cede II*, 634 A.2d at 371 ("A breach of ... the duty of loyalty ...

requires the directors to prove that the transaction was entirely fair."); *Hewlett*, 2002 WL 549137, at *4; *Rainbow Navigation, Inc. v. Yonge*, 1989 WL 40805, at *10 (Del.Ch.1989) (finding no forbidden vote buying because defendants had persuaded the court that an inducement, as a factual matter, had not influenced the votes).

180. JX 218.

the future of that strategic relationship dependent on Saneron's vote was clearly a use by Walton of a valuable asset of the corporation for personal ends. I am not saying that voting decisions of this kind do not always have real world ramifications on relationships. But when a corporate manager's only reason for casting doubt on a strategic partner's ongoing relationship with the corporation has nothing to do with the best interests of the corporation, except insofar as the manager believes her own re-election is critical, using the threat of future non-cooperation is the simple use of a corporate, not personal, asset as leverage to extract a vote. That is inequitable behavior.

Although a change in the voting of the Saneron bloc alone would not have turned the election, Walton's improper conduct and its non-disclosure contributes to my overall sense that the election was tainted by misbehavior by insiders who could not win an election simply using the traditionally powerful advantages afforded incumbents. Our law has no tolerance for unfair election tactics of this kind.[181]

### D. *The Annual Meeting*

■ I now come to Portnoy's last complaint. That is about how Walton conducted the meeting.

As an initial matter, I decline to use this as an excuse to probe the difference between a lunch break and a formal adjournment. The language of the Cryo–Cell bylaws creates a colorable argument that a formal adjournment could not have been declared without stockholder approval and there is doubt whether Walton had sufficient proxies in hand for that purpose.[182] In my view, Portnoy is not positioned to contest Walton's authority to "decide all procedural issues regarding the conduct of the meeting, including adjournment," so long as she did so in good faith.[183] The contending Slates, through their representatives, reached agreement three days before the meeting on certain procedures. That sort of agreement can be thought to have utility, insofar as it provides the contestants with a reliable set of assumptions about how the meeting will be conducted.[184] To have one of the agreeing parties later carp about a provision he assented to undermines the utility of such agreements and creates a risk of electoral uncertainty over trivial missteps in what can be the technically challenging process of running a meeting. Nor, in my view, does a general letter sent on the very morning of the meeting purporting to impose, after the fact, a caveat that the Slates' agreement was subject to the bylaws help Portnoy.

181. *See, e.g., Schnell,* 285 A.2d at 439; *Blasius,* 564 A.2d at 651; *see also Peerless,* 2000 WL 1805376, at *11–12, *15; *Chesapeake,* 771 A.2d at 297 (Del.Ch.2000); *Lerman,* 421 A.2d at 914; *Schroder v. Scotten, Dillon Co.,* 299 A.2d 431, 437 (Del.Ch.1972).

182. Portnoy argues that Article II § 8(b) of Cryo–Cell's bylaws provides the exclusive means to adjourn a stockholder meeting. That section, which is titled "Quorum," states: "Despite the absence of a quorum at any annual or special meeting of shareholders, the shareholders, by a majority of the votes cast by holders entitled to vote thereon, may adjourn the meeting." JX 16 at CRYO 989.

183. JX 228.

184. DAVID A. DREXLER, LEWIS S. BLACK, JR. & A. GILCHRIST SPARKS, III, DELAWARE CORPORATE LAW AND PRACTICE § 24.05[1] (2007) ("[T]here are no statutory guidelines for such routine matters as ... the rules of procedure, if any, which must be followed.... For this reason, parties anticipating a contested vote often find it to their mutual advantage to agree in advance upon procedural details in order to avoid the potential degeneration of proceedings into confusion, if not chaos.").

That "oh by the way" was more than a tad late and did not even reach Walton by meeting time. Moreover, the fact that the agreement could not bar another stockholder from complaining does not mean that Portnoy was free to complain about an act that he agreed Walton could undertake.[185]

What, however, is more uncertain is that Walton acted inequitably in her conduct of the meeting. The reality is that she did not take a "lupper" break of nearly three hours at 2 p.m. so that the attendees at the meeting could eat. Because Walton undertook action that affected the conduct of an election of directors in a potentially important way,[186] the defendants bear the burden to show that Walton's actions were "motivated by a good faith concern for the stockholders' best interests, and not by a desire to entrench [herself.]"[187] They have failed to prove that Walton's tactics were undertaken in selfless good faith.

Walton's behavior during the day was analogous to a corrupted soccer referee, intent on adding extra time so that the game would end only when her favored team had a sure lead. Very early in the meeting, the scheduled course of events had run and all stockholder questions had been answered.

When Walton was asked to count the vote, she replied with the jejune response that the request was out of order. At trial, she could not explain what that response was supposed to mean. It sounds to the court like something out of Robert's Rules of Order that Walton had heard invoked by someone trying to fake their way through a local town council meeting or had seen when watching a congressional debate on C–Span.

This is not to say that Walton had no discretion to keep the polls open. But what she did was to stall without being honest about why she was acting.

If she were being candid, she would have admitted that she was waiting for confirmation that two large blockholders' votes had been switched before having the vote counted. Indeed, if she were being perfectly candid, she would have admitted that she was keeping the polls open so that the Management Slate could continue its efforts to secure more votes by purchase because she was concerned that it would lose even with their votes. Even with less candor, she could have straightforwardly said that she was keeping the polls open to a time certain so that the parties could continue their contest for votes.

Instead, she first tried to pull off a filibuster, subjecting the stockholders to unscheduled bloviation from her management subordinates. Particularly disturbing is Walton's choice to have presentations made on laboratory research and sales when she might have instead released the company's 10–Q, which was already prepared, and had the CFO, who was at the meeting, explain Cryo–Cell's disappointing financial results. But pro-

---

**185.** *See Stengel v. Rotman,* 2001 WL 221512, at *7 (Del.Ch.2001) (holding, in the alternative, that when a removed officer waited one month after an election of directors to contest its validity for an alleged breach of the corporations bylaws, that former officer was barred from asserting his claims by laches, acquiescence, waiver, and ratification).

**186.** *Accipiter Life Scis. Fund, L.P. v. Helfer,* 905 A.2d 115, 125 (Del.Ch.2006) ("In decid-

ing whether an act is an inequitable restraint on the stockholder's franchise, this court has looked closely at the circumstances of each case. Obviously, our courts have been more likely to find an action impermissible if the board acted with the intent of influencing or precluding a proxy contest for control of the corporation.").

**187.** *Inter–Tel,* 929 A.2d at 807.

viding the stockholders with information such as actual up-to-date financial results that might have been material to how they chose to vote their shares was not Walton's concern. Stalling was. During the filibuster, Walton rejected another request to hold the vote. Again, she ruled that request "out of order" for no articulated reason.

It was then that she used the pretense that everyone needed lunch to delay the vote. That move gave her side time, which they used, to ensure that they had the votes to prevail. And lest anyone be moved by the attendees' need for sustenance, by any measure they would have dined earlier—at the traditional time of lunch, in fact—had Walton closed the polls when the events scheduled to precede the vote had concluded.

The defendants, of course, say that the Portnoy Slate should have recognized the need to keep searching for votes during the period when Walton was delaying, and that the Portnoy Slate was less than assiduous in ensuring that its early lead was secured by faithful tending of its proxy-giving flock. And one cannot be but reluctant to set a precedent that helps creates justiciable issues out of delays measured in hours, rather than days or weeks.[188]

**188.** The only Delaware case of which I am aware that has explicitly dealt with the issue of a tactical adjournment in a convened stockholder meeting involved a 30-day adjournment while keeping the polls open on only one of three issues presented to the stockholders for a vote. *See Peerless*, 2000 WL 1805376, at *3; *see also* DAVID A. DREXLER, LEWIS S. BLACK, JR. & A. GILCHRIST SPARKS, III, DELAWARE CORPORATE LAW AND PRACTICE § 24.05[6][b] (2007) ("The *Peerless* decision represents for the present the only judicial direction on tactical adjournments.").

In a recent decision, this court held that directors had not breached their fiduciary duty by postponing a vote on an arms-length merger before a meeting was convened. *Inter-Tel*, 929 A.2d at 818–19. The directors believed that they would lose the vote if it was held that day but had reason to believe that stockholder sentiment was changing, especially in view of changes in the economy's credit markets. A delay ensued during which it was clear to both sides that they needed to continue to press their case, pro and con the merger. As noted in that decision, when directors advocate an affirmative vote on a transaction, they are supposed to do so because they believe in good faith that the transaction will benefit the stockholders. *Id.* at 819. That context is importantly distinct from an actual election of directors, in which the insiders delay because they believe the stockholders are making a mistake in choosing new leadership. In the former case, directors who face no risk of removal are asking for more time to make their case that a non-self-dealing transaction should receive approval. In the latter case, the directors are trying to insulate themselves from ouster, by forcing the insurgents to continue the fight beyond when the election was supposed to be held. Even in that context, room for some discretion has been recognized as necessary, but the court rightly looks at director moves with a deeply furrowed brow. *See Stahl v. Apple Bancorp, Inc.*, 579 A.2d 1115, 1122–23 (Del.Ch.1990) (Chancellor Allen concluding that a board's properly motivated decision to hold an annual meeting *several months later* than it had originally intended because it was facing a proxy contest for board control should not be enjoined).

In this case, unlike in *Inter-Tel*, Walton gave the assembled stockholders false reasons for delay and was not acting in good faith to ensure that stockholders had more time to consider an arms-length transaction that was at danger in a time of economic tumult. Rather, she misled the meeting attendees about the reasons for delay, did not use the period of delay to release a quarterly report that was adverse, and closed the polls as soon as she knew her side would win. Given these facts, Walton's delaying conduct was arguably less fair in effect than if she had adjourned the meeting for several weeks. At that stage, she would have had to face the consequences of the electorate's reaction to the 10–Q and the possible revelation of her new deal with Filipowski. Moreover, it would have been clear to the Portnoy Slate that they needed to continue to fight for every vote.

Nonetheless, it is impossible to ignore the unfairness of Walton's behavior, a justification by reference to effect being no defense to actions affecting a director election that are undertaken for "an inequitable purpose" and in an inequitably deceptive manner.[189] If an electoral contestant assumes the role of presiding over the meeting, she has an obligation to do so fairly. Walton did not do so. She stalled so that her side could win the game, knowing that if the game ended when it was scheduled to end, her side would lose. Then she was dishonest about the reasons for delay.

* * *

For all these reasons, I find that Portnoy has proven that serious breaches of fiduciary duty tainted the election. Before considering what remedy to impose, I must briefly address the defendants' contention that the inequitable conduct of their side should be ignored because Portnoy has unclean hands. After doing that, I address the remedial implications of my findings.

### III. *Unclean Hands*

The defendants argue that Portnoy seeks equitable relief, yet he comes to court with unclean hands. The defendants allege that Portnoy has unclean hands based on his communications with Susan Archibald, a former Cryo–Cell employee. Specifically, the defendants allege that Portnoy induced Archibald to provide him confidential information in violation of a confidentiality agreement that she signed with the company.

Archibald, a former quality systems specialist at Cryo–Cell who was fired in February 2007,[190] contacted Portnoy later same month after she learned that he was seeking to wage a proxy contest.[191] Archibald shared with Portnoy her view that misconduct and misuse of corporate assets was occurring at Cryo–Cell. Portnoy then attempted to communicate that information to the four outside directors on Cryo–Cell's board. Soon after his first contact with Archibald, Portnoy wrote a letter to the outside directors, dated February 20, 2007, which stated:

> [A]s a result of the publicity surrounding [the Portnoy Group's] letter and related amendment of our Form 13d, we received several bits of unsolicited, unsubstantiated, but nevertheless troubling information from individuals purporting to be prior employees of the Company. We have no way of knowing whether these assertions are accurate, but we feel duly-bound to pass them along to you, who are charged with the stewardship of the Company's assets, supervision of its officers, and obligations to its shareholders.

> Therefore, we would like to meet with you, in order to share this information, so that you can determine the best course of action, and whether additional information is warranted.[192]

The response of the Cryo–Cell outside directors to a whistle blower letter by a large group of stockholders was to ask Walton, the only management director, to "handle it in the way she felt best."[193] The outside directors did not even follow up with a letter to Portnoy.[194]

**189.** *Inter–Tel,* 929 A.2d at 807; *Schnell,* 285 A.2d at 439.

**190.** Archibald Dep. at 15–16.

**191.** Tr. at 12; Archibald Dep. at 24.

**192.** JX 33.

**193.** Tr. at 235.

**194.** Tr. at 264.

After the Cryo–Cell outside directors failed to consider the allegations of wrongdoing at the Company, Portnoy continued to communicate with Archibald despite the fact that Archibald had signed a confidentiality agreement with the Company.[195] As Portnoy explained at trial, he did not believe that Archibald was violating her confidentiality agreement because she "was looking to, I believe, protect the assets of the company by providing me with that information."[196] Portnoy, for his part, did not publicly disclose any information that he received from Archibald other than disclosing in a June 14 fight letter that the Cryo–Cell directors had not investigated Portnoy's February 20 letter about receiving unsubstantiated, troubling information from a purported former Cryo–Cell employee.[197]

The defendants seize upon the fact that Portnoy asked Archibald to call Krueger the day before the annual meeting, pointing to Archibald's discussion with Krueger as evidence of wrongdoing by Portnoy. The defendants, however, have provided no evidence of what Archibald and Krueger discussed. When Archibald was asked if she told Krueger "all the negative inside information that [she] had previously provided to Mr. Portnoy," she answered: "No, I don't believe so. I answered the questions that Mr. Krueger asked. That was pretty much about it."[198] The defendants chose not to depose Krueger to find out more information about that conversation.[199] Rather, they merely speculate that "[t]here can be little doubt" that Archibald communicated negative inside information to Krueger.[200] Moreover, Archibald had not worked at Cryo–Cell for over five months at the time she spoke with Krueger, and the only potentially sensitive information that the defendants were able to show that Archibald possessed, that the Company had decided to indefinitely postpone the launch of its Plureon placental stem cell service, had been publicly disclosed months before Archibald spoke to Krueger.[201]

The defendants have failed to identify any confidential information of Cryo–Cell possessed by Archibald that was truly of a sensitive nature, much less that it was misused by Portnoy or even communicated to him. There is at least as much reason to believe that the defendants were wielding the confidentiality agreement against Archibald, not to keep her from revealing trade secrets or business strategies in a way that could aid Cryo–Cell's competitors, but to keep her from discussing improper conduct she observed while at Cryo–Cell. In any event, the defendants' showing on this issue will not support the immunizing effect they desire.

▬ The doctrine of "unclean hands" provides that "a litigant who engages in reprehensible conduct in relation to the matter in controversy . . . forfeits

195. JX 3.

196. Tr. at 16. Archibald did ask Portnoy if she could get her job back if Portnoy prevailed in the proxy contest. Tr. at 47. Portnoy refused, promising only that "she would be given the opportunity to interview for the job and, if she was the most capable person, then she would be entitled to the job." Tr. at 48. Archibald's email response to Portnoy's offer to consider her for her old position expressed disappointment, but Archibald continued her communication with Portnoy anyway. JX 38 at Archibald 50.

197. JX 131.

198. Archibald Dep. at 133.

199. It is likely that the defendants feared what Krueger might say. See supra note 101.

200. Def. Op. Post-trial Br. at 33.

201. Tr. at 44–45.

his right to have the court hear his claim, regardless of its merit."[202] "[T]he purpose of the clean hands maxim is to protect the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims, regardless of their merit. As such it is not a matter of defense to be applied on behalf of a litigant; rather it is a rule of public policy."[203] Therefore, "[t]he question raised by a plea of unclean hands is whether the plaintiff's conduct is so offensive to the integrity of the court that his claims should be denied, regardless of their merit."[204] "This court has consistently refused to apply the doctrine of unclean hands to bar an otherwise valid claim of relief where the doctrine would work an inequitable result."[205]

I do not agree that Portnoy comes to this court with hands dirty enough to deny him any relief. Portnoy's conduct was far from ideal. Although one can understand his frustration at the board's refusal to undertake a disinterested review of the concerns Archibald brought to his attention, Portnoy responded by engaging in conversations that, I have little doubt, involved literal violations of Archibald's confidentiality agreement. Had he behaved most scrupulously, Portnoy could have pressed Cryo–Cell to take her concerns more seriously, by filing suit if necessary. Responding to one perceived wrong with a furtive course of contractually-questionable conduct is not laudable.

 That said, unclean hands is a doctrine designed to protect the integrity of a court of equity, not a weapon to be wielded by parties seeking to excuse their own inequitable behavior by pointing out a trifling instance of impropriety by their counterpart, especially when the defendants cannot show that Portnoy's conduct caused any harm to Cryo–Cell as a corporation or to its disinterested stockholders.[206] Portnoy's conduct, while being far from pristine, falls well short of disqualifying him from seeking relief.

Denying Portnoy relief on the basis of unclean hands would work an inequitable result by denying Cryo–Cell's stockholders the right to fairly conducted election of directors, something that DGCL § 225 was enacted to ensure.[207] It would be unjust to permit the defendants to invoke the confidentiality agreement, which was designed to protect Cryo–Cell, to shield themselves from accountability for their inequitable behavior. That said, I do take Portnoy's behavior into account in shaping the final relief I award to him, but in a manner that

---

**202.** *Nakahara v. The NS 1991 American Trust,* 739 A.2d 770, 791–92 (Del.Ch.1998) (internal quotation omitted).

**203.** *Skoglund v. Ormand Indus., Inc.,* 372 A.2d 204, 213 (Del.Ch.1976).

**204.** *Gallagher v. Holcomb & Salter,* 1991 WL 158969, at *4 (Del.Ch.1991).

**205.** *Dittrick v. Chalfant,* 2007 WL 1039548, at *5 n. 18 (Del.Ch.2007) (citing *Cole v. Kershaw,* 2000 WL 1206672, at *4 (Del.Ch.2000)).

**206.** To be clear, my decision is based on my determination that Portnoy's conduct does not rise to the level of inequity where he should be denied relief. Harm, of course, is not strictly required for the doctrine of un-

clean hands to bar relief. *See Nakahara,* 739 A.2d at 794 ("Equity does not reward those who act inequitably, even if it can be said that no tangible injury resulted.").

**207.** *Cf. Belle Isle Corp. v. Corcoran,* 49 A.2d 1, 4 (Del.1946) (refusing to apply the doctrine of unclean hands to bar relief, even if for the sake of argument, the plaintiff who was seeking to having a voting trust agreement declared invalid was guilty of misconduct because "the public policy of this State, as announced under [the DGCL section on voting trust agreements], will not be disturbed by the application of [the unclean hands] doctrine.").

is more proportionate and that does not injure the Cryo–Cell electorate.

## IV. *The Remedy*

■ I come now to the question of the appropriate remedy. Although Portnoy would have me simply declare his slate the victor, I do not believe that is the most appropriate remedy. Given how close the contest was and the reality that Filipowski actually acquired beneficial ownership of the shares he voted, I think the remedy that best vindicates the interests of Cryo–Cell stockholders as a class is to order a prompt special meeting at which a new election will be held and presided over by a special master.[208] Until that time, the incumbents who sat on the Cryo–Cell board before the 2007 annual meeting will continue in office; Filipowski's claim to office has no pre-existing legitimacy and he shall leave the board until he is elected by the stockholders.

For their part, the defendants carp about the holding of a special meeting, supposedly out of a concern for the financial interests of Cryo–Cell. Although that concern is legitimate, it does not lie gracefully in their mouths to voice as an excuse to insulate themselves from a fair election challenge. The defendants' desire to wait for an annual meeting in the summer is self-serving and inequitable, given that it is their Slate's behavior that tainted the election held last year.

A more fitting way to address the cost concerns is to require the Management Slate to bear the costs of their own proxy solicitation efforts, the costs to the corporation of holding the meeting, and the costs of a special master to conduct the meeting.[209] This will ensure that the Cryo–Cell stockholders are not injured by the requirement for an extra meeting. Given the misconduct by the Management Slate, this is a fitting and proportionate remedy. Nor will the remedy place the Management Slate at a disadvantage to any insurgent slate, it will simply level the playing field.

Not surprisingly, the defendants pull out an old tool of corporate incumbents whose electoral shenanigans requires this court to order a special meeting—that the corporation's annual report is not ready and the SEC will not let them solicit proxies. That is their problem and they should seek relief, if necessary, from the SEC. Having felt free to delay a meeting through the presentation of time-wasting presentations that did not include quarterly results contained a 10–Q that they filed a half hour after the polls closed, the defendants are unusual champions of the need for full disclosure before stockholder votes. As this court has indicated previously, the SEC's requirements are well-intended

---

**208.** The DGCL gives this court wide discretion to craft a remedy in the case of a tainted election. Section 225(a) provides:

[T]he Court of Chancery may hear and determine the validity of any election, appointment, removal or resignation of any director . . . and the right of any person to hold or continue to hold such office, and in the case any such office is claimed by more than 1 person, may determine the person entitled thereto; *and to that end make such order or decree in any such case as may be just and proper* . . . . *In case it should be determined that no valid election has been*

held, the Court of Chancery may order an election to be held in accordance with § 211 [the DGCL section on stockholder meetings]. . . .

8 *Del. C.* § 225(a) (emphasis added); *see also* 8 *Del. C.* § 227(b) (allowing the court to appoint a master to conduct an election ordered under § 225 "under such orders and powers as it deems proper").

**209.** *See* 8 *Del. C.* § 225(a) (allowing the court to "make such order or decree in any such case as may be just and proper").

ones designed to protect stockholders; they are no basis to insulate corporate insiders from their obligations under the corporation law governing their company's relations to its stockholders.[210]

In terms of the financial obligations imposed on the defendants, I note that I focus their responsibilities on remediating the harm they have caused to the corporation in a proportionate and constructive manner. I reject Portnoy's request to have the defendants or Cryo–Cell pay his litigation and proxy solicitation costs. I do so in deference both to the traditional American Rule approach our jurisprudence embraces and as a fitting consequence for Portnoy's dalliance with Archibald, a course of conduct that I do not believe disentitles him to a remedy but that ought to have some consequence. By rejecting Portnoy's request for reimbursement of his litigation and proxy costs, I limit the defendants' exposure to paying the costs of holding a special meeting, which should not be onerous if the parties are sensible, which the special master will ensure.

The parties shall collaborate on the appropriate date and location for a prompt special meeting and present a conforming order, in advance of seeking a conference this week with the court at which the order will be finalized and a special master appointed.

---

**210.** *See Esopus Creek Value LP v. Hauf,* 913 A.2d 593, 606 (Del.Ch.2006) (observing with respect to sections 14(a) and 14(c) of the 1934 Act that " '[n]othing in ... that statute ... suggests any purpose to interfere with the power of state courts to require that stockholder meetings be held in accordance with the requirements of state corporation law in situations where the registrant corporation is delinquent in its SEC filings obligations.' ") (quoting *Newcastle Partners, L.P. v. Vesta Ins. Group, Inc.,* 887 A.2d 975, 980–81 (Del.Ch. 2005)).